**NATIONAL LABOR RELATIONS BOARD v. CONDENSER CORPORATION OF AMERICA et al. (ELECTRICAL CONDENSERS UNION, LOCAL B-1041, OF THE INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, Intervener).**

**No. 7683.**

Circuit Court of Appeals, Third Circuit.

Argued Jan. 5, 1942.

Decided March 25, 1942.

Morris P. Glushien, of Washington, D. C. (Robert B. Watts, Gen. Counsel, Laurence A. Knapp, Associate Gen. Counsel, Ernest A. Gross, Asst. Gen. Counsel, and Joseph B. Robison, all of Washington, D. C., on the brief), for petitioner.

George D. Zahm and Abraham J. Rosenblum, both of New York City, for Condenser Corporation.

Eugene F. Frey, of Newark, N. J. (Otto A. Jaburek, of Chicago, Ill., on the brief), for Cornell-Dubilier.

Before BIGGS, MARIS, CLARK, JONES, and GOODRICH, Circuit Judges.

GOODRICH, Circuit Judge.

In this proceeding by the Labor Board against the above named parties, the Cornell-Dubilier Electric Corporation (referred to hereafter as Cornell) disclaims liability on the ground that it is not an employer within the meaning of § 2(2) of the Labor Relations Act, 29 U.S.C.A. § 152(2). It argues, therefore, that it is not responsible for the unfair labor practices charged. The relationship of Cornell to the other corporate respondent, the Condenser Corporation, and the former's interest in the latter, cannot fairly be described, as the respondents seek to characterize it, as that of a customer in the manufacturer's product. Condenser, a New York corporation, does the manufacturing. Cornell, a Delaware corporation, purchases materials and sells them at cost to Condenser. The manufactured goods are acquired by Cornell from Condenser at the latter's cost and are then sold by Cornell. In February, 1937, the two corporations became affiliated through common ownership of their stock. Since August 28, 1937 Condenser has been a wholly owned subsidiary of Cornell.

When the hearings in this proceeding were instituted in February, 1937, Condenser was the sole respondent; Cornell was not brought in and the Brotherhood[1] did not intervene, until June. The Board has limited its consideration of the evidence to that adduced subsequent to the joinder of Cornell and the Brotherhood so far as these parties are concerned. With respect to the discriminatory discharges of employees proved at the first hearing the Board's order is limited to Condenser.

Under these circumstances we believe the relationship of these two corporations is such that an order pursuant to the provisions of the statute is proper against both, in view of the careful limitation which the Board has made with regard to the discharges. This is in no sense a penalty against the parties for an arrangement which is deemed by them to be in the interests of efficiency. It simply rests on the premise that where in fact the production and distribution of merchandise is one enterprise, that enterprise, as a whole, is responsible for compliance with the Labor Relations Act regardless of the corporate arrangements of the parties among themselves. What is important for our purpose is the degree of control over the labor relations in issue exercised by the company charged as a respondent. Press Co., Inc., v. National Labor Relations Board, 1940, 73 App.D.C. 103, 118 F.2d 937. Regardless of what Cornell says concerning its connection with Condenser's employees it appears that "together, respondents act as employers of those employees * * * and together actively deal with labor relations of those employees". National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., 1938, 303 U.S. 261, 263, 58 S.Ct. 571, 572, 82 L.Ed. 831, 115 A.L.R. 307. Evidence of this is abundant. Some is manifest from our discussion, later in this opinion, of various aspects of union activity and employer interference. It will suffice at this time to point out that Cornell's officers were very active in dominating the original local union, Independent, and again, in bringing negotiations with that group's successor, Brotherhood, to a culmination. It is noteworthy, too, that the reinstatement of some of the men first discharged was arranged with Cornell's president, Mr. Blake. This and similar evidence is controlling in our disposition of the question of Cornell's status as an em-

---

[1] "Brotherhood" is used in this opinion to designate Electric Condenser Workers Union, Local No. 1041-B, International Brotherhood of Electrical Workers, American Federation of Labor. "United" refers to United Electrical and Radio Workers of America, Committee for Industrial Organization; "Independent" refers to Condenser Workers Independent Union.

ployer. As has been said, "* * * the problem is not to be approached from the standpoint of vicarious liability". Consolidated Edison Co. of New York, Inc., v. National Labor Relations Board, 2 Cir., 1938, 95 F.2d 390, 394, modified on another point, and affirmed, 1938, 305 U.S. 197, 59 S. Ct. 206, 83 L.Ed. 126.[2] It is rather a matter of determining which of two, or whether both, respondents control, in the capacity of employer, the labor relations of a given group of workers. National Labor Relations Board v. Lund, 8 Cir., 1939, 103 F.2d 815, 819.

▌ Furthermore, the finding of fact that respondent, Cornell, as an employer within the meaning of § 2(2) of the Labor Act, has committed certain unfair labor practices, is a finding which, like other findings of fact, is for the Board to make and for us merely to review from the standpoint of supporting substantial evidence. Bethlehem Steel Co. v. National Labor Relations Board, 1941, 74 App.D.C. 52, 120 F.2d 641. We find such evidence in the record before us.

### Respondent Interference with Employee Organization

▌ The Board has found that the respondents have been guilty of unfair labor practices by interfering with employees in the formation of a labor organization. This is in violation of employees' rights, guaranteed by the statute, to conduct their organization and collective bargaining through representatives of their own choice.

▌ The Board's conclusions on this part of the case seem to us abundantly clear and to say that they are supported by substantial evidence is a cautious understatement. Some of the pertinent facts with regard to employer interference appear in the discussion, later in this opinion, concerning discharges of individual employees. The beginning of the series of events leading to the discharges and culminating in the Board's order is as follows: One of the principal actors in the present drama is Mr. Frank Diana, a citizen of South Plainfield, New Jersey. Mr. Diana, acting on behalf of the South Plainfield Chamber of Commerce, was instrumental in inducing the respondents to come to South Plainfield. He played an important part also in the securing of a reduction of the tax assessment on the site occupied by the plant and was likewise active in helping to procure employment there for local people. After the discharge of Hughes (described below) it was not long before Diana was found engaged in matters pertaining to labor affairs. It was through his intervention, as appears below, that some of the discharged men were reinstated. At the meeting with these men the day before their return to work there was discussed the possibility of forming an organization which would deal with the workers' grievances without getting them discharged. It is a matter of dispute whether the original suggestion came from Diana or the men. In any event, at the interview the following morning with Cornell's president, Blake, the latter said he had no objection when Diana said the "boys wanted to have an organization there, and were going to organize the workers in the plant". It is significant that by this time, the organization of United had already culminated in the issuance of a charter by the United Electrical and Radio Workers of America, the election of the officers of the local and a request by United to negotiate with the employer.

It was against this background that with the permission of Blake, Diana used the plant telephone and conference room to arrange to meet with representatives selected by the employees of each department. It is clear, and the Board found, that within a few days after the return to work of some of the discharged checkers, Diana conferred with what he called the "Committee of 23". This was the group selected by the workers when Diana telephoned their superiors that he was organizing it with Mr. Blake's permission. Although the record is far from clear concerning the exact date and chronological sequence of the events that followed, this is what happened. The committee met with Diana at least one more time before a mass meeting, arranged by Diana, was held at the Park Theatre in South Plainfield. At this meeting temporary officers of Independent were elected. On February 1, with, according to Diana's testimony, Blake's per-

---

[2] Cf. International Ass'n of Machinists, etc., v. National Labor Relations Board, 1940, 311 U.S. 72, 80, 61 S.Ct. 83, 85 L.Ed. 50, where the Supreme Court applied the same theory in rejecting the rule of respondeat superior in deciding liability of an employer for acts of socalled agents.

mission, the former toured Condenser's plant and addressed 6 or 7 groups of employees concerning the advantages of the Independent. Again the source of ultimate authority is somewhat in doubt, but at any rate, a number of the supervisors and foremen issued orders that the workers stop production and gather around Diana. As his various talks were concluded he and different workers distributed to the listeners membership cards in the Independent. Testimony is abundant that at the time, some of the distributors cautioned the workers to "sign or else". In one instance, when an employee expressed a desire not to sign because of greater faith in the United, one of Condenser's assistant foremen remarked, "Oh, you're one of them".[3] This aspect of the case is more fully developed in connection with our detailed discussion of the various discharges.

 Following this membership campaign the newly elected officers met several times with Diana who, though perhaps informally, served as chairman of the meetings and conducted most of the actual business for the group. Again this took place in Condenser's conference room and again, as to some of those attending, during working hours. The latter were allowed to leave their places in advance of quitting time so that they could be present. At the request of the workers Diana called on Mr. Beyer, Cornell's secretary and treasurer, and presented, as the Independent's spokesman, their grievances. At one meeting around February 2 or 3, both Beyer and Cornell's president, Blake, were present to hear the committee's request for a 10% wage increase. This request was subsequently replaced by a flat 5 cent an hour increase. In this form it was presented to Blake for the first time between February 4 and 6; a compromise three cent raise was approved the next day and went into effect on February 15. Prior to the latter date Condenser posted a notice of the agreement, referring to it as having been made with the representatives of the majority of the workers. While the Board found that majority representation was not the fact we think this not controlling one way or the other; if the organization is company dominated in violation of the Act,

the fact that a majority have joined is immaterial. And it is clear from the evidence outlined above that there is more than substantial evidence to support the Board's finding that the Condenser Workers Independent Union was established at respondent's instigation and with their aid. It may be borne in mind, in this connection, that Blake had in the meantime had no decisive conference with United's representative; that the February 11, 1937 issue of the plant paper carried several items, including editorials, praising the Independent and attacking the CIO, with which United was affiliated, and that United Workers were being discharged. At this point, somewhere around February 16, the company sponsored Independent group "dissolved" and was replaced by the Brotherhood.

 In such a situation it is now settled as a matter of law that there must be a definite, clear line of cleavage between the two organizations in order for the latter to be free from the taint of employer domination found to be prevalent in the former. Roebling Employees Ass'n, Inc., v. National Labor Relations Board, 3 Cir., 1941, 120 F.2d 289, and cases cited therein. This alone would be sufficient, for the establishment of the line of fracture is, under the decisions, an affirmative obligation resting upon the employer.

But in addition to the lack of such an affirmative disinheritance of the company fostered Independent, we have here evidence of at least cultivation and encouragement, by respondents, of its successor, Brotherhood. It is no doubt true that there was no formal transfer, as there would be under some statute for the merger of one corporation into another or the consolidation of two into a third. But traces of company sponsorship are unmistakable. The group at the helm of the company sponsored Independent appears in a leading role in the Brotherhood. In the matter of the transfer, Diana who had been pictured in the plant paper as high in the good graces of the company, emerges as a dominant and busy figure. There was a dismissal of company employees at an hour earlier than ordinary quitting time on the day of the first Brotherhood mass

**3** Respondents disclaim liability for this and similar incidents involving under-superiors. The complete answer has been given by the Supreme Court in National Labor Relations Board v. Link-Belt Co., 1941, 311 U.S. 584, 599, 61 S.Ct. 358, 85 L.Ed. 368; International Ass'n of Machinists, etc. v. National Labor Relations Board, 1940, 311 U.S. 72, 80, 61 S.Ct. 83, 85 L.Ed. 50.

meeting. In at least one instance a forewoman openly expressed the reason for the early dismissal as being the management's desire that employees attend the meeting. Some of Condenser's supervisors and forewomen were active in urging the workers to sign the Brotherhood cards. Additional basis for a conclusion of company encouragement of Brotherhood is revealed in the history of the negotiations between them. The Board found that the Brotherhood did not have within its membership the requisite majority of workers until after the election meeting of February 18. And that the contract between union and employer was signed the very next day—a contract with provisions for checkoff and a closed shop. Respondents claim that the Brotherhood exhibited majority membership on February 17 and that it was only then that negotiations were instituted. Even conceding, without deciding, error on the Board's part in this instance, it is nonetheless of moment that the contract was signed at the next conference only two days later and only after over half of the alleged majority membership were sworn into the organization in accordance with its rules and regulations.

No one of these items is, perhaps, conclusive. But it is well to refer here to the oft-quoted language of Mr. Justice Douglas in International Ass'n of Machinists, etc., v. National Labor Relations Board, 1940, 311 U.S. 72, 78, 61 S.Ct. 83, 88, 85 L.Ed. 50: "Known hostility to one union and clear discrimination against it may indeed make seemingly trivial intimations of preference for another union powerful assistance for it. Slight suggestions as to the employer's choice between unions may have telling effect among men who know the consequences of incurring that employer's strong displeasure." The existence of each of the facts here and the conclusions to be drawn therefrom are vigorously disputed. But we find them supported by evidence and taken together, sufficient to justify a conclusion that the transfer of Independent to Brotherhood was not free from company participation. This, coupled with the absence of affirmative disestablishment by the company of Independent, makes the Board's legal conclusion clear.

### Reinstatement and Back Pay Order

The Board's findings and its petition in this court include the subject of reinstatement and back pay for a group of named individuals, former employees of the respondents. These persons were found by the Board to have been discharged because of their union activity; reinstatement and back pay are directed for them. Respondents deny that any or all of these workers were discharged because of union activity and allege that the termination of their services was for cause sufficient to justify discharge. Each of the cases is made subject for discussion in the respondents' briefs. We have examined both the argument and the record with regard to each of the employees whose discharge is in dispute, bearing in mind that here, as elsewhere, our task is not to make the finding of fact, but only to determine whether the finding made by the agency designated by law is supported by substantial evidence. Conclusions to be drawn from conflicting testimony and fact inferences to be drawn from evidence presented is likewise not within our province. National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., 1938, 303 U.S. 261, 270, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307. Our function ceases with determining whether facts and inferences so drawn have substantial support. We turn then to the consideration of the individual cases.

1. *Edward Hughes.* This employee, head of the group known as checkers in Condenser's plant, was discharged December 16, 1936. He secured employment elsewhere soon thereafter. The reason given to Hughes for his discharge by his supervisor, in the presence of Mr. Beyer, Cornell's secretary and treasurer, was the failure of Hughes to punch the time card, as company rules required, and which failure was admitted by Hughes himself. The records of the company note the reason for the discharge as inaccuracies in the records for which he was responsible. The Board finds, however, that Hughes was discharged because of his action in attempting to obtain increased wages for checkers under his supervision and that this was a restraint and coercion of employees in the exercise of rights secured by § 7 of the Act, 29 U.S.C.A. § 157. That Hughes had discussed the problem of such increased wages and the desirability of union organization with his supervisor in the plant is not disputed. The question now in issue reduces itself to a fact concerning human motives, namely, the real reason for the discharge of Hughes. His case, like that of other discharged employees for that mat-

ter, was considered by the Board as part of the entire litigation in the course of which the attitude of the respondents toward labor organizations in their South Plainfield plant had been developed. The finding with regard to Hughes is supported by substantial evidence and will not be disturbed.

■■■ 2. *Lawrence Dowling.* 3. *Joseph Russo.* 4. *John Spisso.* 5. *Joseph De Sepio.* The cases of these men can be considered together. The sole question with regard to them is whether they were discharged in violation of their rights under the statute. The Board does not dispute the contention that the employee may be discharged by the employer for a good reason, a poor reason, or no reason at all, so long as the terms of the statute are not violated. Burk Bros. v. National Labor Relations Board, 3 Cir., 1941, 117 F.2d 686. But it does not follow from that undisputed proposition of law that a failure to give a reason, or giving evasive or contradictory reasons by management may not be considered in determining the question of fact as to the real motive for the discharge. These employees, checkers in the department where Hughes had been employed, all attended a meeting at the home of one Peterson, another employee, following the discharge of Hughes, for the purpose of protesting to Condenser against the discharge. The next day they were all let go, the orders being given by Chait, Hughes' successor as head checker. Spisso and De Sepio were subsequently rehired through the intervention of Diana, whose activity in connection with the company's affairs has already been mentioned. When they subsequently manifested their disinclination to go along with Diana in the formation of an independent union and expressed their desire to adhere to United, which by that time they had already joined, they were almost immediately discharged. Respondents assigned reasons of inefficiency and rule breaking. In their cases, however, the chain of circumstances which prompted the Board's conclusion that the reason for the discharges was organizational activity of a sort disapproved by the employer, is such as to support that conclusion with substantial evidence too strong, even on examination of a paper record, to be resisted.

Dowling and Russo were not rehired and their cases do not have the added support of a second hiring and discharge. As said above they did attend the informal protest meeting. Respondents maintain that the sole basis of the Board's finding concerning the reason for the discharge of these two men is the inference drawn from the presence at the meeting of one Zieborak, another checker, but at the same time an employee of a private investigating agency. Even disregarding any significance in Zieborak's presence at the meeting,[4] there is, nevertheless, substantial evidence in the record which supports the Board's conclusion that there is considerably more than a coincidental connection between their attendance at the meeting on one night and their discharge the following afternoon. The Board's findings as to these four employees stand.

6. *Theodore D'Addario.* This employee, who first held the position of a checker, was discharged January 8, 1937. He was subsequently rehired and came back as one of the group in whose reinstatement Mr. Diana had become interested. He, too, was one of those who, upon being reemployed, manifested his adherence to United, with which he had become affiliated. He had attended the informal discussion and subsequent organization and other meetings of the United. The Board's conclusion that the real reasons for his first dismissal were not the alleged reasons of inefficiency given by the employer at the hearing is supported by the circumstances of the second discharge almost immediately following Diana's failure to get D'Addario, along with the group whose reinstatement he had secured, to go along with him in the effort to form an independent organization. The Board's conclusion is sustained.

7. *Herbert Peterson.* This man, once employed as a checker, was discharged December 23, 1936 by the then head checker, Chait. The Board finds the discharge was because of activity on the employee's part looking toward union organization. The respondent contends it was for inefficiency. The Board found that Chait told Peterson that he liked his work but was compelled to discharge him. Peterson's activity with regard to promoting, by talk at least, the start of employee organization is clear. It was at his home

4 Cf. Bethlehem Steel Co. v. National Labor Relations Board, 1941, 74 App.D. C. 52, 120 F.2d 641, 647.

that the first two meetings were held. While his case is not so strong as that of some of the others, D'Addario for instance, we cannot say that the Board's finding is not supported by substantial evidence.

8. *Vincent Binicasso.* 9. *William Wolf.* 10. *Harry Burr.* 11. *John Mazza.* Three of these four, Binicasso, Burr and Mazza, were among the "Diana group" already referred to. Wolf and Binicasso were alleged by the company to have been discharged because of the violation of the "No Smoking" rule. Wolf had never been discovered smoking before; Binicasso once. Except for these two no employees were ever discharged for the offense and there was some evidence to the effect that, at least so far as the men's room was concerned, (where these two were caught smoking) the rule was honored more in the breach than the observance. The alleged reason for Burr's discharge was inefficiency; that of Mazza, lack of work. Mazza's employment record lists "unsatisfactory work" as the cause and the Board points out that at the time he was let go his identification button was lifted, which was the custom in the case of discharge rather than temporary layoff.

As would be expected in such cases the testimony and argument present both conflicting facts and conflicting theories. The three cases mentioned of the men dismissed, rehired and again discharged following the Diana incident have the same added measure of support as that found in those already reviewed. Wolf's case does not have this and is not, therefore, quite so strong. But the Board finds, as a fact, that the real reason for the discharge in all four cases is that these employees were making beginnings of collective activity. This finding has support and it therefore must stand.

 12. *Lucy Dell'Olio.* This employee's job was to stamp on finished condensers certain information which it was her duty to secure from the proper specification sheet. Respondents contend that, as a result of using the wrong specification sheet, she improperly stamped a quantity of condensers intended for filling a rush order; and that she was therefore discharged. Her explanation is that between the time she first inspected the information sheet and the time she looked at it again after having been informed of her error, another sheet had been slipped into the book over the one originally there.

From this the Board draws the conclusion that the entire episode was engineered in order to provide an excuse for her discharge. This seems reasonable in view of the fact that the day before she was let go she had been warned by the assistant foreman, according to her testimony, that the company would find a good excuse to dismiss anyone who had joined the union. She nevertheless had on that very night attended United's second mass meeting and had been elected secretary, the news of which was published in the local paper. She had previously been seen by another supervisor leaving a United mass meeting and had been warned to stay away if she valued her job. The evidence is clearly sufficient to support the Board's finding.

 13. *Gladys Del Pappa.* This employee was discharged January 21, 1937. The Board finds the cause to be the fact that she joined and assisted United. She, with Dell'Olio had been warned as she left the United meeting of January 14, to keep away from that group under penalty of losing her job. The following day, along with other employees, she was transferred from the department where they had been working to different work. This transfer, however, cannot be the basis for a conclusion unfavorable to the company because it affected many employees in the same department as Del Pappa. She was, however, assigned to particularly disagreeable work in which she had no previous experience and to which only one other employee was transferred. When, later on, the girls were being transferred back to their original tasks Del Pappa asked to be returned likewise. There was some dickering and she expressed a desire to be temporarily laid off rather than continue doing the objectionable work. She was forthwith discharged. It is a point not without significance that while the operating supervisors recommended her retransfer the veto power was exercised by the personnel manager, Mrs. Leary. It may be borne in mind also that it was at this time that the effort to promote the Independent was going forward vigorously. The evidence is not so compelling as in the case of Dell'Olio, just discussed, but we cannot say that the Board's conclusion does not have substantial foundation and it is, therefore, upheld.

 14. *Katherine Kane.* 15. *Augusta Kane.* 16. *Beatrice Mundy.* These three women employees had joined United.

The company had posted a notice stating that neither failure to join a union nor joining one was a condition of employment. Nevertheless, Mr. Diana had been permitted, during working hours on February 1, to address the workers upon the advantages of joining Independent. Membership cards were passed around for signatures. These three girls refused to sign application cards for Independent and reiterated their adherence to United. That day they were discharged. There is countervailing testimony tending to show that they were discharged or more euphemistically, laid off, because of slackness of work and frivolous behavior while at work. The issue was purely one of fact and there is substantial evidence to support the Board's conclusion that they were discharged in violation of their rights under the statute.

■ 17. *Marion Panzarella.* This employee was discharged February 1, 1937. He had joined United, but there is no suggestion that this membership had anything to do with his dismissal. A group of the solderers, of which he was one, had, on the Friday prior to the discharge, decided they wanted an increase in compensation and had directed one of their number to act as spokesman. The latter presented their claim to their foreman who promised to see the plant superintendent and to report his answer the following Monday. The foreman was unable, however, to see his superior by the latter date but promised the solderer's spokesman that he would do so sometime on Monday. On that morning, however, the solderers came to the plant, checked in and stood idle at their benches. They were persuaded to continue work during the morning; following the noon recess they again stood idle, saying that they would not work until their demands were met. Thereupon they were discharged. The operation in which the solderers were engaged was an initial one in this particular department and the interruption here necessarily affected the work of the others. The Board concludes that the discharge of Panzarella under these circumstances was a violation of rights under § 7 of the statute and argues that our decision in Southern Steamship Co. v. National Relations Board, 3 Cir., 1941, 120 F.2d 505, covers the case. We think to the contrary. In that case the employer had refused recognition of a bargaining agency voluntarily chosen by the employees. Here the plant superintendent had promised the men a discussion at the close of the day's activities. The Board found this as a fact. Yet, in the face of this, the men stopped work in the middle of the day. We do not think that under the circumstances the statute prevents their discharge. Cf. C. G. Conn, Ltd., v. National Labor Relations Board, 7 Cir., 1939, 108 F.2d 390, 397. Employees cannot insist that their demands be met in the middle of a working day, when the employer has promised to deal with them as a group at the end of the day. No promises had been broken; there was nothing to indicate that this particular promise would not have been kept. Panzarella and his associates were not denied rights under the Act. The order for reinstatement and back pay in his case is, therefore, refused.

■ 18 to 31 inclusive. This group of cases involves fourteen employees: *John Sedon, Michael Santoro, Fred Vitto, Katherine Dolce, Mary Schumacher, Arthur Chippendale, John DiVico, Ann Jacobs, Caroline Callecchio, Tessie Appezzatio, Michael Sabino, Herbert Rydberg, Katherine Fedoruk, Francis Prohodka.* These cases present no disputed question of fact. In accordance with the closed shop contract made with the Brotherhood February 19, 1937 these employees were discharged because of their suspension by the Brotherhood for pro-United activities. If the contract with the Brotherhood was not in violation of the statute, it follows, as the respondents urge, that their discharges were proper. The Board urges that the contract was in violation of the statute and that it is thus clear, as a matter of law, that the fourteen discharges were likewise. The Board's conclusion that the closed shop contract made with the Brotherhood was improper is supported elsewhere in this opinion. The conclusion follows and the action of the Board is upheld as to these cases.

■ 32. *Frank La Vecchia.* This employee had joined both United and the Brotherhood, the latter ostensibly in order to keep his job because of the closed shop contract between respondent and the Brotherhood. He was discharged on March 31 for engaging in and inducing other employees to participate in a stoppage of work on that day. He testified that he and two others had previously discussed this strike with United officials and had received "indirect" orders to proceed. As

is apparent from other discussion in this opinion respondents had actively committed unfair labor practices both by supporting Independent (later the Brotherhood) and by the discharges. outlined immediately above as being discriminatory because of United activities. This strike which produced La Vecchia's discharge was the employees' answer to this illegal activity on the part of the respondents. It is thus quite different from the case of Panzarella, already discussed. The attitude and behavior of the respondents at the time of this strike was such as to justify, at least with reference to the question of cause for discharge, this action on the part of La Vecchia and the other employees. The request, at the start of the strike, that they step outside and discuss the matter peaceably was only a gesture and does not serve, in the face of known facts, as an offer to bargain collectively. Cf. International Ass'n of Machinists, etc., v. National Labor Relations Board, supra. The Board's finding, therefore, that this employee was discharged in violation of his rights under § 7 of the Act is sustained.

33. *Ann Mae Therney.* 34. *Cecilia Dowling.* 35. *Mary Lane.* 36. *Margaret Gibbs.* One common element in these last four cases is that of time. Their discharges came subsequent to those previously discussed and following the rise in power of the Brotherhood in respondents' plant. The other common factor is the dispute as to cause of discharge, whether for activity on behalf of United, as the Board has found, or slack work, incompetency, irregular attendance, and insubordination, as respondents contend. The argument invites us to substitute our conclusion for those of the Board in believing some witnesses and disbelieving others. This we do not do. There is testimony which, if believed, is ample to support the Board's findings. What credence is to be given one witness over another is not within our province. We find in all of these cases the Board's conclusion is supported by substantial evidence and is upheld.

### Back Pay Order

The Board's conclusion with respect to back pay points out that the employees within the purview of its benefits would ordinarily be entitled to the sums equal to the respective amounts they would normally have earned as wages from the date of the discharge to the date of the offer of reinstatement, less their respective net earnings during this period. The Board, in this case, because of circumstances of delay which have occurred since its inception, has directed that the usual computation be reduced by one half. Respondents obviously do not complain about this. They do complain, however, about a proposal to award back pay to employees who, they say, have refused or not sought other employment, but stood "idly by".

The Board says this point is made too late since it was made for the first time in this Court. Of course we do not dispute the proposition that a question not raised before the Board is not properly brought before us upon petition for enforcement. The statute expressly covers that. 29 U.S.C.A. § 160(e). But respondents did file exceptions to the back pay order and did, at the hearing, question some of the witnesses with regard to other employment since their respective discharges. This was true of Russo, who admitted to having refused another job. It is true likewise of Gibbs, cf. Subin v. National Labor Relations Board, 3 Cir., 1940, 112 F.2d 326, 331, Schumacher, Lane and Rydberg. We think that it is open to the respondents to raise the point. The disposition of the point thus raised is, however, a matter of more difficulty. Authority in this Circuit and elsewhere has inclined to the view that the well established rule of avoidable consequences should apply to the recovery of back pay by wrongfully discharged employees. National Labor Relations Board v. Suburban Lumber Co., 3. Cir., 1941, 121 F.2d 829, 834; Phelps Dodge Corp. v. National Labor Relations Board, 2 Cir., 1940, 113 F.2d 202, 206; Subin v. National Labor Relations Board, supra. But cf. National Labor Relations Board v. West Kentucky Coal Co., 6 Cir., 1940, 116 F.2d 816, 821 (dicta). The Board, however, has consistently refused to go quite so far. Fourth Annual Report, National Labor Relations Board (1939) pp. 100–102.

This question met discussion by the Supreme Court in Phelps Dodge Corp. v. National Labor Relations Board, 1941, 313 U.S. 177, 198 et seq., 61 S.Ct. 845, 854, 85 L.Ed. 1271, 133 A.L.R. 1217. That decision makes it clear that " * * * deductions should be made * * * also for losses which [the worker] willfully incurred", but that it is incorrect for a court to modify the Board's order to provide for those deductions. Rather, "The matter should [be] left to the Board for deter-

mination by it * * *" in the exercise of its administrative discretion.[5] Nevertheless, it is a matter to be considered here, as well. We shall not, therefore, modify the Board's back pay order by reduction in the amount these employees could have earned elsewhere after discharge by respondents. We shall, however, insert a modification that the amount (if any) of back pay is to be reduced by that which the Board, in its discretion, finds appropriate to deduct because of failure or refusal of any employee to obtain other employment.

### Complaints Regarding Hearing

Respondents have given us 46 pages of printed brief and several times that quantity of references to printed record to show that their constitutional rights of due process of law were violated because the hearing was not full and fair. With the fundamental assumption that the respondents were entitled to fair play there can be no dispute. Some of the points, urged, however, hardly reach the status of objections which might be urged under the most technical and formal review by an appellate court of a trial at common law. We shall not lengthen this opinion by stating these in extenso.

The first is the objection that respondents' motions and arguments were heard off the record. Presumably the most this can show is bias, because while the statute requires testimony to be recorded it does not require the perpetuation in a typewritten record of everything that lawyers say. Nor do we know any precept of constitutional law to demand otherwise. In the second place, the point made must refer to arguments alone because we do not find instances where the motions themselves are not recorded. There was an abundance of argument at the hearing and the transcript is so full of it that it is sometimes difficult to find questions asked and the answers given by the witnesses. At times there were four attorneys all making objections and each presenting arguments in support thereof. This matter of the record of argument was surely one to be controlled by the discretion of the examiner and a reading of the record does not show us that he abused that discretion.

Counsel complain also about the action of the examiner with regard to ordering adjournments, although in fairness it should be said that they do not claim that treatment on this score did more than cause personal inconvenience to them. Personal inconvenience to counsel can hardly be classified as lack of due process of law. In reality we believe this point has been made to lead to the next one, which is respondents' complaint that the examiner showed personal hostility towards and made attacks upon their counsel. The hearing in this case, not unlike other law suits, was not conducted in a uniform atmosphere of urbanity. We do not get the impression that counsel was setting out to induce prejudicial error on the part of the examiner. But objections were made thick and fast. The atmosphere was confusing and occasionally things were said that were not conducive to dignified and orderly procedure. If the examiner was at times unduly severe with counsel it may be said that counsel were at times lacking in observing proprieties to the examiner. We find nothing on this point for reversal. Equally without merit is the complaint that the Board's counsel was permitted to control the proceedings.

Considerable stress is placed on rulings regarding leading questions. A short answer might be made that this is a matter considered within the control of the trial judge in an ordinary law suit. 3 Wigmore on Evidence, 3d Ed. 1940, §§ 770, 776. The examiner in a less formal administrative hearing surely has no less discretion in this regard. Furthermore, we do not agree with respondents in their complaint concerning the nature of numerous questions to which they referred in their argument. They characterize a great many as leading which do not seem so to us at all. Nor do we see eye to eye with them concerning what witnesses were hostile or unwilling. Mr. Blake, for instance, presi-

---

5 "The Board has a wide discretion to keep the present matter within reasonable bounds through flexible procedural devices. The Board will thus have it within its power to avoid delays and difficulties incident to passing on remote and speculative claims by employers, while at the same time it may give appropriate weight to a clearly unjustifiable refusal to take desirable new employment. By leaving such an adjustment to the administrative process we have in mind not so much the minimization of damages as the healthy policy of promoting production and employment." Phelps Dodge Corp. v. National Labor Relations Board, 1941, 313 U.S. 177, 199, 200, 61 S.Ct. 845, 855, 85 L.Ed. 1271, 133 A.L.R. 1217.

dent of Cornell, from his very position in the controversy would seem to us to be the type of witness to whom questions of the cross-examination type would be appropriately directed. We doubt whether respondents intend to complain so much of this as of alleged discrimination in restricting their own witnesses. We think, on the whole, however, that examination of witnesses to which reference is made in the record shows that the trial examiner allowed cross-examination by respondents to go very far. We do not find any instance where he finally cut if off in abuse of discretion on his part.

■ The respondents contend that the order compelling them to reveal in advance the purpose of certain questions was prejudicial in that it compelled them to disclose their plans of defense, "thus enabling the Board attorney and the examiner to frustrate those plans and curtail the proof". We do not find, however, any record of the appropriate motion to disqualify the examiner for bias and our statement upon that subject made in the case of National Labor Relations Board v. Baldwin Locomotive Works, 3 Cir., 128 F.2d 39, is sufficient comment upon this point. The same can be said concerning the objection that the examiner "protected and favored" the Board's witnesses.

■■ Finally, complaint is made concerning the procedure in issuing subpoenas. The rule of the Board, at the time of this hearing, required applications for subpoenas to be timely and to specify the name of the witness and the facts to be proved by him.[6] Respondents criticize the procedure as "cumbersome and creaky". That it is less convenient for a party than the prompt issuing of a subpoena upon request may be conceded. On the other hand, the Board is a public agency and is responsible for performing its public functions. This means that the inquiry in a given case must be kept within reasonable limits and the requirement that a party disclose what he wants to prove by a witness before a subpoena is issued for him is doubtless

designed to accomplish that result. The rule has met severe criticism. Inland Steel Co. v. National Labor Relations Board, 7 Cir., 109 F.2d 9, 18-21; dissenting opinion in Bethlehem Steel Co. v. National Labor Relations Board, supra, 74 App.D.C. 52, 120 F.2d at pages 659-661; Note (1940) 53 Harv.L.Rev. 842, 848. On the other hand, courts in several Circuits, while refraining from unqualified endorsement of the rule, have refused to find it violative of due process where no prejudice has been shown in a given case. National Labor Relations Board v. Blackstone Mfg. Co., Inc., 2 Cir., 1941, 123 F.2d 633; Bethlehem Steel Co. v. National Labor Relations Board, supra; National Labor Relations Board v. Ed. Friedrich, Inc., 5 Cir., 1940, 116 F.2d 888; National Labor Relations Board v. Dahlstrom Metallic Door Co., 2 Cir., 1940, 112 F.2d 756; North Whittier Heights Citrus Ass'n v. National Labor Relations Board, 9 Cir., 1940, 109 F.2d 76.

■ The instances of the application of the rule in the litigation under consideration show some inconvenience and some understandable exasperation, but nothing which rises to the formidability of prejudice. One instance has to do with the witness Carey, who was general president of United. However, Carey came to the hearing pursuant to subpoena. The complaint made by respondents really is that the examiner did not interpret the order to call for what counsel insist Carey should have produced. In any event, counsel's protest did bring from United's attorney records which are admitted to satisfy the subpoena. Another source of complaint involves the case of the editor of the Peoples Press, the official organ of the United. Here, too, the trouble was not in getting the subpoena for it had been granted. Respondents' point is that it was dishonored by the recipient and that the examiner would do nothing about it. Be that as it may, the Board's counsel was willing to stipulate and did stipulate all possible facts to which the witness, if present, could have testified. A third instance

---

6 "Any member of the Board may issue subpenas requiring the attendance and testimony of witnesses and the production of any evidence, including books, records, correspondence, or documents that relate to any matter under investigation or in question, before the Board, its member, agent, or agency, conducting the hearing or investigation. Applications for the issuance of such subpenas may be filed by any party to the proceedings with the Regional Director, or, during the hearing, with the Trial Examiner. Such applications shall be timely and shall specify the name of the witness and the nature of the facts to be proved by him, and must specify the documents, the production of which is desired, with such particularity as will enable them to be identified for purposes of production." N.L.R.B. Rules and Regulations, Series 1, as amended, Art. II, § 21.

has to do with the order for the production of the records of the employer of one Anne Coley in connection with her earnings after discharge by respondents. The Board has dismissed the complaint with reference to her. Obviously, no prejudice is present here. On another occasion counsel for respondents made a point of getting into the record his insistence upon subpoenas, rejecting the suggestion from the Board's counsel that the witnesses would be produced without them. And again, at other times to which reference is made the evidence for which subpoenas were asked was readily stipulated. We have checked each instance of complaint made by respondents and find no one of them to contain anything that rises above the point of petty annoyance. Whatever may be the criticism of what is perhaps a cumbersome rule there is nothing in this case upon which the respondents may attack it as failing to give them due process of law.

Effect of Events Subsequent to Hearing

By a motion to adduce additional testimony the respondents press the significance of certain events which have taken place subsequent to the hearing and order in this litigation.

The first of these events is the claimed establishment of the present Brotherhood unit as an independent bargaining agent. The respondents point out that, following its recognition by them, Brotherhood has asserted its independence by vigorous demands in favor of its members; that this took place on at least two occasions at the expiration of the period for which the closed shop contract had been made. On each of these occasions there has been a strike, together with the violence which not infrequently accompanies a strike. Intervention of federal mediation assistance was secured and a resumption of employment accomplished under terms said by respondents to be satisfactory to the employees. All this, they argue, shows that the employees are now represented by an independent bargaining agent.

The second point ties up with the first. It is that at the present time the greater part of production of respondents' plant is concerned with the output of materials used directly or indirectly in the country's important defense effort. They point out that the abrogation of the present contract and the disestablishment of the union would leave the employees, at least temporarily, without a bargaining agent, with the attendant danger of labor disturbance and interruption of necessary production.

As to the first argument we think the law on the subject clear. The legal situation has to be viewed as of the time of the Board's Decision; otherwise there is the danger, often spoken of, of making a merry-go-around of the Act. National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., supra; Oughton v. National Labor Relations Board, 3 Cir., 1940, 118 F.2d 486, 496, et seq. The Board has found, and we have sustained the finding, that the establishment of the Brotherhood in respondents' plant was not the result of that free choice of a bargaining agent by employees which is guaranteed by the statute. The choice does not become a free choice by the lapse of time, when membership of both then and new employees is assured in the established bargaining agent by a closed shop contract. It is quite obvious, so far as the legal situation is concerned, that the effect of the original non-compliance with the law still continues.

The second consideration, namely, the serious nature of the production of everything that pertains to war industry is of obvious importance. But the argument of lawyers in a courtroom that the disestablishment of a present bargaining unit and the abrogation of a present contract will disturb that production or will not disturb it is necessarily pure speculation. The Board is charged with the responsibility of representing the public interest, not that of private litigants. This the courts have said over and over again. Neither we nor counsel may assume that the Board is not conscious of all the factors to be taken into consideration in the present emergency nor have we any reason to assume lack of competence on their part to arrange such adjustment as is necessary to preserve the public interest. The problem is peculiarly one for expert administration and that the statute has lodged in the Board, not the courts. National Labor Relations Board v. Link-Belt Co., supra; International Ass'n of Machinists, etc., v. National Labor Relations Board, supra.

The Board's petition for an enforcing decree is granted and a decree may be submitted in accordance with this opinion. The petition for leave to adduce additional evidence is denied.