**EDWARD G. BUDD MFG. CO. v. NATIONAL LABOR RELATIONS BOARD.**

**No. 8054.**

Circuit Court of Appeals, Third Circuit.
Argued Nov. 2, 1942.
Decided Sept. 7, 1943.

As Amended on Denial of Rehearing
Oct. 25, 1943.

Henry S. Drinker and L. Halpern Miller, both of Philadelphia, Pa., for intervenor.

Joseph B. Robison, of Washington, D. C., for appellee.

Before BIGGS, MARIS, and GOODRICH, Circuit Judges.

BIGGS, Circuit Judge.

On charges filed by International Union, United Automobile, Aircraft and Agricultural Workers of America, an affiliate of the Congress of Industrial Organizations, with the National Labor Relations Board, a complaint issued dated November 26, 1941, alleging that the petitioner was engaging in unfair labor practices within the meaning of Section 8(1), (2), (3) of the National Labor Relations Act, 49 Stat. 449, 29 U.S.C.A. § 158(1), (2), (3). The complaint, as subsequently amended, alleges that the petitioner, in September, 1933, created and foisted a labor organization, known as the Budd Employee Representation Association, upon its employees and thereafter contributed financial support to the Association and dominated its activities. The amended complaint also alleges that in July, 1941, the petitioner discharged an employee, Walter Weigand, because of his activities on behalf of the union, and in October of that year refused to reinstate another employee, Milton Davis, for similar reasons.[1] The petitioner denies these charges as does the Association which was permitted to intervene. After extensive hearings before a trial examiner the Board on June 10, 1942 issued its decision and order, requiring the disestablishment of the Association and the reinstatement of Weigand and Davis.

Until the creation of the Association in 1933 no labor organization had existed in the petitioner's Philadelphia plant. Upon

---

[1] The complaint as amended also alleged that the petitioner had terminated the employment of Patrick J. Nelligan and refused to reinstate Ray Weigand and John F. Brown. The allegations concerning the petitioner's treatment of these employees, though held to be established by the trial examiner in his intermediate report, were not sustained by the Board.

The complaint also alleged that the petitioner had interrogated employees concerning their membership in the union. No finding was made by the trial examiner or the Board on this point and the charge finds no support in the evidence. The allegations that the petitioner had assigned certain employees to engage in acts of espionage were withdrawn.

the passage of the National Industrial Recovery Act of June 16, 1933, 48 Stat. 195, some of the petitioner's employees desired to form a labor organization. Alminde, who worked in the petitioner's shipping department, tried to get a charter from the American Federation of Labor for a union to be composed of shipping department employees. This was refused. Thereupon he and some other members of the shipping department decided to form a labor organization. To facilitate this purpose Alminde went to Sullivan who was an assistant works-manager and requested a meeting with Harder, the works-manager. On August 24, 1933, Sullivan, Harder, McIlvain, the chief personnel officer, and Mahan, another assistant works-manager, met with Alminde and his committee from the petitioner's shipping department. At Alminde's request Sullivan produced a plan for employees representation which with some substantial modifications remains in effect today. Sullivan read the plan to Alminde and the other employees present, who felt, to use Alminde's words "* * * that they hadn't heard anything new, that in principle it was practically what they had in mind all the time, * * *." After some discussion, conducted by the employees in the absence of the management representatives, Alminde on behalf of his committee requested the management group to prepare and present a plan similar to that read by Sullivan to all employees and suggested also that an election be held for the purpose of electing representatives under the plan.

A notice of the proposal was posted in the plant on September 1, 1933.[2] On September 5th the management caused to be placed in the time card rack of each employee the following: a pamphlet entitled "Proposed Plan of Employee Representation", a folder entitled "Preliminary Announcement of the Establishment of a Budd Employee Representation Association"[3] signed by President Edward G. Budd, and a ballot to be used for nominating employee representatives. On September 7th the election was held and nineteen employee representatives were elected. The expenses of this election were paid by the petitioner and it was held on company time and on company property.

The plan provided a method according to which the representatives should represent their constituents, the workmen, and divided the plant geographically into eleven election districts. Each of these elected representatives. The plan provided that all workmen who had been on the payroll for ninety days might vote for representatives and that any employee (save the supervisory employees) who was at least twenty-one years of age and had been employed for a period of a year, was entitled to stand for election as a representative. The representatives were to vacate their offices upon becoming officials, foremen or "leaders" of the company. Five management representatives were appointed by the petitioner and these sat with the employee representatives at meetings, but were not entitled to vote except on amendments to the plan. A clause of the plan provided that "Any method of procedure" set out in the plan could be amended at any time by a vote of a majority of the employee representatives with the concurrence of a majority of the management representatives.[4] Numerous committees were set up and

---

[2] This was as follows:
"Notice
"September 1, 1933

"A number of our organization have expressed a wish to have a shop organization to use as a means of indicating their problems to the company. At the present time there are a number of these organizations throughout the country which are operating successfully for employees and employers.

"Plans will be made so that all the employees in the different units will have a chance to elect by ballot someone to represent them. Starting immediately something will be worked out along these lines and layed [sic] before you for consideration the early part of next week.
"D. S. Harder
"Works Manager."

[3] The "Preliminary Announcement" stated in part:

"At the request of some of your number we are proposing that you elect representatives exclusively of your own group who will, upon election, organize themselves, elect from among their own number, officers, and adopt a plan to regulate their operation.
*       *       *       *       *
"In order to permit the employees to properly exercise this voting privilege fifteen minutes will be allowed for which the company will pay the hiring rate.

"This is your Association, and your opportunity. Be sure you are represented by exercising your vote."

[4] There is some dispute in the testimony as to the origin of this provision of the plan. The petitioner contends it

these negotiated with the management in respect to wages, grievances and conditions of employment. The company paid $2 to each representative per month for attending meetings of the representatives.

The Association was in fact considered to be composed of all the workmen at the petitioner's Philadelphia plant. The representatives elected officers for the Association precisely as if they had been a board of directors electing officers for a corporation. There was no formal enrollment of members in the Association by membership applications and no dues. The plan contained no specific provision that the representatives should serve as a collective bargaining agency for the employees.

We think that the Board was entitled to assume as it has that the plan was put into operation on September 11, 1933, when, following the election of employee representatives on September 9th, an organization meeting was held by the employee representatives and the management representatives. After introductions the management representatives left the conference. Alminde was elected the first chairman of the Association.

Meetings of the representatives were held from time to time; the committees which had been appointed functioned actively. The management adopted a most cooperative attitude toward the Association. This was to be expected. What had happened was that the management had found a group of its own employees who desired to create a labor organization and the company had sponsored and created the Association at their request. The petitioner's attitude toward its employees seems to have been one of friendly interest. Nevertheless, we entertain no doubt that the plan and the Association were in fact sponsored,

largely created and supported by the petitioner. The Association could not have continued to exist had the Budd Company withdrawn its support.

The relations of the petitioner and its employees were disrupted to some extent when on November 13, 1933, a union affiliated with American Federation of Labor called a strike at the Philadelphia plant. About 15% of the petitioner's employees went out on this strike which was ineffective. It had happened, however, that the union had filed charges with the National Recovery Administration stating that the Association was dominated by the petitioner. On February 11, 1934, Chairman William H. Davis of the National Recovery Administration Compliance Board, came to Philadelphia and had a meeting with the employee representatives. On the advice of Mr. Davis certain changes were made in the plan. We shall not refer to all of them. The changes which were of some consequence follow. A representative might retain his status despite promotion to the position of a foreman or leader. The requirement of twelve months' previous employment in the plant in order to be eligible for election as a representative was stricken out. The Association and not the petitioner was required to provide a suitable place for the annual elections for representatives. The provision for management representatives to sit at meetings was changed so that the management representatives should attend meetings only at the request of employee representatives. The provision for the payment by the petitioner of $2 a month to representatives attending meetings was done away with. The provision relating to amendments was itself amended to result in the confusing provisions set out below.[5]

originated with the employees themselves. The Board takes the position that this requirement was suggested by Personnel Director McIlvain. We do not consider its source to be of great importance. No one denies that it was an essential part of the plan and was the subject of frequent argument. There is evidence to the effect that it was inserted in the plan in order that the management might have "a guiding hand" in the operation of the Association.

[5] The amended provision read as follows:
"(1) Any method· of procedure * * * [under the Plan] may be amended at any time by the concurrent action of a majority of the Employee Representatives and of a majority of the Management Repre-

sentatives (providing the matter concerns both men and management).

"(2) Any method of procedure referring to employees and employees' interest only may at any time be amended by the majority vote of the Employee Representatives. And shall be put before the employees for approval if any substantial change in the plan is to be effected."

The plan was frequently amended subsequently. The amended provsision for management representatives apparently was retained until the inauguration of the 1937 plan. So far as we can ascertain, there was never any controversy between the men and the management as to when the interests of the employee ceased and those of the management began.

The plan as changed met with the approval of the Director of the National Compliance Board and was submitted in printed form to the employees. An election was scheduled for March 1, 1934 and preparation for conducting it were made by the Compliance Board. The AFL union was included as a candidate on the ballot. The holding of the election was postponed until March 9 at the request of Chairman Davis. On the evening of March 8th the National Recovery Administrator communicating with the employee representatives through the medium of the petitioner's attorney, requested that the election be postponed in order that questions relating to eligibility of voters which had been raised by the union affiliated with the AFL, might be settled. Despite this request the election was proceeded with. It was discovered that no provision had been made for election officers or tellers (vice those which were to have been supplied by the Compliance Board) and the petitioner, at the request of the employee representatives, hired and paid the accounting firm of Price, Waterhouse & Company to conduct the election. The election, which was held on company property, resulted in 3,152 votes being cast for the Association and approximately 1,995 votes being cast for the AFL union. The employees who were out on strike did not vote. The National Recovery Administration thereupon ordered another election to be held on March 20th at Pulaski Hall, but the AFL union picketed this election and very few employees voted at it.

We do not attach much significance to the fact that the election of March 9th was held despite the request of the National Recovery Administration that it be postponed. We do not doubt that this election was conducted honestly. We cannot agree, however, with the contention of the petitioner that the changes effected in the plan and the holding of the election of March 9 were sufficient to create that clean break, that "line of cleavage", required between an old union and the new in order that the new union may be considered to be free of company domination. National Labor Relations Board v. Newport News Shipbuilding & Dry Dock Co., 308 U.S. 241, 250, 60 S.Ct. 203, 84 L.Ed. 219; National Labor Relations Board v. Condenser Corp., 3 Cir., 128 F.2d 67, 73; National Labor Relations Board v. Baldwin Locomotive Works, 3 Cir., 128 F.2d 39, 49; National Labor Relations Board v. McLain Fire Brick Co., 3 Cir., 128 F.2d 393, 394; Roebling Employees Ass'n v. National Labor Relations Board, 3 Cir., 120 F.2d 289, 295, 296. Nor can we conclude that anything which transpired since March 9, 1934 constituted the break required by the National Labor Relations Act. The evidence looks the other way.

The subsequent history of the Association must be stated briefly. The payment by the petitioner of employee representatives for attending meetings should have ceased on the adoption of the 1934 plan, but probably did not come to an end in fact until early in 1935. See the testimony of Alminde, p. 186a. None of the plans subsequent to the 1934 plan was submitted directly to the rank and file membership of the plant for their approval or disapproval by ballot or otherwise. None of the plans ever contained any provision for the payment of dues. The petitioner in fact did not pay any expenses of election after 1934. The Association raised funds by employee dances and beer parties until an agreement was made in 1937 for the allocation to it of a portion of the income of the Employees' Exchange to the Association. The Employees' Exchange had come into existence as a benevolent association to help the petitioner's employees during the depression. It had loaned money to the petitioner's employees without interest and had distributed parcels of food. Operating as a concessionaire on the petitioner's premises, the Exchange, then unincorporated, sold candy and tobacco to the petitioner's employees. In 1937 the Exchange was not meeting its expenses, apparently due to a withdrawal of patronage by the employees. It was suggested to Desing, the head of the Exchange and one of the petitioner's personnel directors, by one of the employee representatives that the employees would support the Exchange if the Exchange would in turn support the Association. The Exchange agreed to pay the Association (under the 1937 agreement) 50% of all profits up to $3,000 and 60% of all profits over $3,000. The petitioner was a party to some of the contracts between the Association and the Exchange. The sums received by the Association from its agreement with the Exchange were more than sufficient to pay the expenses of the annual elections of employee representa-

tives. The petitioner has never contributed any money to the Exchange, but the Exchange is able to operate on the petitioner's premises because the petitioner permits it to do so. The concession can be terminated at the end of the period specified by the contract. We doubt if the petitioner would refuse to renew the concession, but if it did it may be doubted that the Association would continue to exist.

Another indication of the dependent nature of the Association should be referred to. We think it is symptomatic. The petitioner treated the employee representatives with extraordinary leniency. The testimony shows to what very great lengths the employer went in its parental treatment of the Association and its officers. The petitioner permitted the employee representatives to conduct themselves about as they wished. They left the plant at will whether on personal business or on the business of the Association. Some of them did very little or no work but they received full pay. It is clear that some of them, Walter Weigand for example, were not disciplined because they were representatives. We can scarcely believe that the petitioner would have displayed such an attitude toward officers of an undominated "adversary" labor organization.

In our opinion the decision of the Board to the effect that the Association was and is subject to the petitioner's domination and control is amply supported by the evidence.

As to the decision of the Board requiring the reinstatement of Milton T. Davis, we find there is sufficient evidence to support the conclusion that this employee was discriminated against because of his connection with the CIO affiliate which filed the charge with the Board.

■■ The case of Walter Weigand is extraordinary. If ever a workman deserved summary discharge it was he. He was under the influence of liquor while on duty. He came to work when he chose and he left the plant and his shift as he pleased. In fact, a foreman on one occasion was agreeably surprised to find Weigand at work and commented upon it. Weigand amiably stated that he was enjoying it.[6] He brought a woman (apparently generally known as the "Duchess") to the rear of the plant yard and introduced some of the

employees to her. He took another employee to visit her and when this man got too drunk to be able to go home, punched his time-card for him and put him on the table in the representatives' meeting room in the plant in order to sleep off his intoxication. Weigand's immediate superiors demanded again and again that he be discharged, but each time higher officials intervened on Weigand's behalf because as was naively stated he was "a representative." In return for not working at the job for which he was hired, the petitioner gave him full pay and on five separate occasions raised his wages. One of these raises was general; that is to say, Weigand profited by a general wage increase throughout the plant, but the other four raises were given Weigand at times when other employees in the plant did not receive wage increases.

The petitioner contends that Weigand was discharged because of cumulative grievances against him. But about the time of the discharge it was suspected by some of the representatives that Weigand had joined the complaining CIO union. One of the representatives taxed him with this fact and Weigand offered to bet a hundred dollars that it could not be proved. On July 22, 1941 Weigand did disclose his union membership to the vice-chairman (Rattigan) of the Association and to another representative (Mullen) and apparently tried to persuade them to support the union. Weigand asserts that the next day he with Rattigan and Mullen, were seen talking to CIO organizer Reichwein on a street corner. The following day, according to Weigand's testimony, Mullen came to Weigand at the plant and stated that Weigand, Rattigan and himself had been seen talking to Reichwein and that he, Mullen, had just had an interview with Personnel Director McIlvain and Plant Manager Mahan. According to Weigand, Mullen said to him, "Maybe you didn't get me in a jam." And, "We were seen down there." The following day Weigand was discharged.

As this court stated in National Labor Relations Board v. Condenser Corp., supra, 3 Cir., 128 F.2d at page 75, an employer may discharge an employee for a good reason, a poor reason or no reason at all so long as the provisions of the National Labor Relations Act are not violated. It is,

---

[6] Weigand stated that he was carried on the payroll as a "rigger". He was asked what was a rigger. He replied: "I don't know; I am not a rigger."

of course, a violation to discharge an employee because he has engaged in activities on behalf of a union. Conversely an employer may retain an employee for a good reason, a bad reason or no reason at all and the reason is not a concern of the Board. But it is certainly too great a strain on our credulity to assert, as does the petitioner, that Weigand was discharged for an accumulation of offenses. We think that he was discharged because his work on behalf of the CIO had become known to the plant manager. That ended his sinecure at the Budd plant. The Board found that he was discharged because of his activities on behalf of the union. The record shows that the Board's finding was based on sufficient evidence.

The order of the Board will be enforced.