**NATIONAL LABOR RELATIONS BOARD
v. ELECTRIC CITY DYEING CO.**

No. 10042.

United States Court of Appeals
Third Circuit.

Argued Dec. 20, 1949.

Decided Jan. 11, 1950.

Harold M. Kowal, Philadelphia, Pa. Washington, D. C. (David P. Findling, Associate General Counsel, A. Norman Somers, Assistant General Counsel, Frederick U. Reel, Rosanna A. Blake, Attorneys, National Labor Relations Board, Washington, D. C., on the brief), for appellant.

Marcus Manoff, Philadelphia, Pa. (Harry A. Kalish, Aaron M. Fine, Paxson, Kalish, Dilworth & Green, Philadelphia, Pa., Joseph T. McDonald, Scranton, Pa., on the brief), for respondents.

Before GOODRICH and HASTIE, Circuit Judges and GRIM, District Judge.

GOODRICH, Circuit Judge.

This is a petition by the National Labor Relations Board in the usual form for an enforcement order against the respondents, who are a partnership consisting of a husband and wife as co-partners and a corporation formed by them after the acts complained of. The Board found that the respondents had committed certain unfair labor practices and the order written by the Board is in a form appropriate to the findings.

The enforcement sought will be ordered. There is ample evidence on the whole record to sustain the findings of unfair labor practices with regard to the following:

1. Surveillance by the employer and his representatives. When Fred L. Nuttall, the managing partner, heard rumors of an attempt at union organization in his plant he arranged to have one of his employees go to the meeting and see who attended. To make assurance doubly sure, he and his wife and his superintendent, Heilig, and the latter's wife all observed the employees going into the meeting from an automobile parked near the union hall. Because they could not see well enough from the car they went into a hotel across the street from the hall, from which vantage point they could see into the meeting-room. After the meeting was over, they got a report from the employee detailed to spy out the land. There is not the slightest doubt that on these facts an unfair labor practice has been committed. N.L.R.B. v. Clark Bros. Co., 2 Cir., 1947, 163 F.2d 373, 375.

2. The second unfair labor practice is found in a speech delivered by Nuttall to his day shift just before the union organization meeting and to his night shift immediately after the meeting. It is quite true that as the law stands at present[1] an employer may express an opinion upon union organization as well as upon any other subject in the world. But he cannot coerce, intimidate or give promise of benefit as part of his opposition to a union program. The Nuttall speech did all three. He characterized employee conduct as an "unfriendly act." He invited dissatisfied employees to quit. He outlined a benefit program about which nothing had been said before, but which, fortunately, was on hand to bring out when the threat of union organization appeared. He warned employees that there was "more to be gained from friendly management than there is from one whose hand may be forced unfairly in this manner." We have no doubt that the Board was fully justified in finding that the speech constituted an unfair labor practice.

1. Section 8(c) of the amended Act provides that "The expressing of any views * * * shall not constitute or be evidence of an unfair labor practice * * *, if such expression contains no threat of reprisal or force or promise of benefit." 29 U.S.C.A. § 158(c). See N.L.R.B. v. O'Keefe & Merritt Mfg. Co., 9 Cir., 1949, 178 F.2d 445; Edward G. Budd Mfg. Co. v. N.L.R.B., 3 Cir., 1944, 142 F.2d 922.

3. Following the discharge of certain employees, a matter which will be discussed presently, a strike was called at the plant. Nuttall sent out a notice to employees giving them a specified time before which they were to return to work, telling them in the notice that if they did not do so "association as an employee with this company will be terminated as of that moment * * *." The strikers were still the employees of the respondents.[2] To threaten them with discharge if they persisted in lawful organizational activity was to interfere with and coerce them in violation of the Act.

4. Following the labor organization meeting, nine employees were summarily discharged. The Board found that seven of the nine were discharged because of their union activity. The respondents contend that they were discharged because of unsatisfactory work. The Board considered this matter and made a specific finding that "the Respondents discharged [the employees] not because of the calibre of their work but because of their activities on behalf of the union."

As we said in N.L.R.B. v. Condenser Corp. of America, an "employee may be discharged by the employer for a good reason, a poor reason, or no reason at all, so long as the terms of the statute are not violated." 3 Cir., 1942, 128 F.2d 67, 75. We are concerned here, as in the Condenser case, with a question of fact concerning human motives, "namely, the real reason for the discharge". 128 F.2d at page 74. If the record permits conflicting conclusions as to the real reason for the discharges, we may not disturb a permissible conclusion reached by the Board.

The contention of the employer is that the unsatisfactory work of the employees in question was the reason for their discharge. This unsatisfactory work was particularly in connection with that being done for a man named Jacobson, who was respondents' biggest customer. In weighing the evidence, the Board was entitled to consider such facts as the following: (a) Of six employees working exclusively on Jacobson work, three were discharged and three not. The dischargees had all attended the union meeting; the others not, so far as we know; (b) The bulk of the Jacobson work was "basic" not "fancy" dyeing. But Nuttall discharged two of his fancy dyers who had attended the union meeting; no basic dyers were let go; (c) The expressed hostility of Nuttall to unionization; (d) The acts constituting unfair labor practices set out above; (e) The timing of the discharges and that they were made without consultation with the superintendent or anyone in immediate contact with employees.

Since the point concerning the discharges has been urged upon us with force, we consider the individual cases of the discharged employees.

(1) Helen Gilasevitch was known to have been elected secretary-treasurer of the local. She testified that she had never been criticized about her work and the two other people in her work team were not discharged with her. There was also evidence that she was heedless of her work, that her foreman had complained about her to Nuttall, and that she did not get along well with her associates. Her co-workers, however, thought enough of her to make her a union officer. She could have been discharged because of unsatisfactory work, but the Board's finding that the real reason lay in her union activity is supported by substantial evidence. (2) There was evidence that Anthony Marciano, who attended the organization meeting, was an incompetent employee and that he had been criticized twice for poor workmanship. Perhaps his slipshod sorting of garments headed for the dyeing room resulted in some of them being dyed the wrong color, but there was also testimony by the plant superintendent that the dyers frequently took garments which Marciano had not yet checked. (3) Flory Morelli was chosen chairman of the union local. It was his job to inspect outgoing garments. He had been warned to be more discriminating in

2. N.L.R.B. v. Mackay Radio & Telegraph Co., 1938, 304 U.S. 333, 345, 58 S.Ct. 904, 82 L.Ed. 1381.

passing finished work, but there was evidence that his percentage of rejections was no less in the months immediately preceding his discharge than formerly. (4) John Morelli was a brother of the union chairman and had never been criticized for the quality of his work, which consisted of sorting finished garments. Customers' complaints that they received garments belonging to others could be attributed to his carelessness, but as in the case of Marciano and Flory Morelli, the Board could and undoubtedly did weigh against evidence of inefficiency the summary nature of the discharges, their timing and the respondents' anti-union animus.

(5) Leo Kelly and (6) George Magakis were both made members of the union grievance committee at the organization meeting. Kelly was described by his superiors as "not reliable" but faulty work was not traced directly to him. Magakis was one of the experienced "fancy" dyers employed by the respondents and his work had never been criticized. There was testimony that Kelly's fondness of drink resulted in frequent absences and that Magakis took advantage of a malarial condition to stay home more often than was necessary.

 (7) Bernard Czankner seems to be the weakest of the helpers discharged. He was probably guilty of sloppy packing, and Heilig testified that he should have been discharged five months earlier. But for some time prior to the discharges, respondents had a list of over forty persons seeking employment, and we cannot say that the Board gave undue weight to the timing of the discharge, which closely followed Czankner's presence at the union meeting. Czankner's work apparently became intolerable only after he had joined the union. Cf. Agwilines, Inc. v. N. L. R. B., 5 Cir., 1936, 87 F.2d 146, 154. Moreover, it matters not that for reasons apart from union activity an employee deserves summary discharge if as a fact the reason was union activity. Edward G. Budd Mfg. Co. v. N. L. R. B., 3 Cir., 1942, 138 F.2d 86, 90, certiorari denied, 1944, 321 U.S. 778, 64 S.Ct. 619, 88 L.Ed. 1071.

Having found that the discharges were discriminatory and in violation of the Act, the Board properly ordered reinstatement with back pay under Section 10(c), 29 U.S.C.A. § 160(c). N. L. R. B. v. Dixie Shirt Co., 4 Cir., 1949, 176 F.2d 969. An offer of limited reinstatement made by the respondents in August, 1946, and rejected by the union, did not have the effect of tolling the running of back pay after that date. The offer did not contemplate reinstatement at any definite time, nor at the former positions held by those discharged, but merely promised that the employees could return as work became available for them. There was no offer of back pay and no provision for the replacement of persons hired subsequent to the strike. See N. L. R. B. v. Van Deusen, 2 Cir., 1943, 138 F.2d 893, 895.

The order will be enforced.