## NATIONAL LABOR RELATIONS BOARD v. BROWN CO.

### No. 4215.

#### Circuit Court of Appeals, First Circuit.

March 5, 1947.

FORD, District Judge, dissenting.

Louis Libbin, of Washington, D. C. (Gerhard P. Van Arkel, Gen. Counsel, Morris P. Glushien, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, and Owsley Vose and Margaret M. Farmer, Attys., all of Washington, D. C., on the brief), for petitioner.

Harry E. Smoyer, of Cleveland, Ohio (John W. Jordan, of Berlin, N. H., on the brief), for respondent.

Before MAHONEY and WOODBURY, Circuit Judges, and FORD, District Judge.

WOODBURY, Circuit Judge.

This is a petition brought by the National Labor Relations Board under § 10(e) of the National Labor Relations Act, 49 Stat. 453, 29 U.S.C.A. § 160(e) for enforcement of an order entered by it pursuant to § 10 (c) of the Act directing the Brown Company to cease and desist from engaging in certain labor practices found to have had the effect of dominating and coercing its office employees in the formation and administration of an independent labor organization called the Brown Company Office Workers Association, and to post appropriate notices.

The respondent Brown Company is a Maine corporation having not only its principal office but also its manufacturing plant in Berlin, a city in northern New Hampshire. It employs several thousand persons in the manufacture of wood pulp, paper, various paper products, and chemicals, a large proportion of which it ships in interstate commerce. The Board's jurisdiction in the premises under § 10(a) and § 2(6, 7) of the Act, 29 U.S.C.A. §§

160(a) and 152(6, 7), cannot be successfully disputed and in fact is stipulated.

The Board's action rests upon a charge made by the Regional Director in Boston of United Mine Workers of America District 50. In its complaint based upon this charge the Board alleged in substance that the respondent on or about October 3, 1944, warned certain of its employees that working conditions would be "worsened" if the Union won an election then pending among certain of its employees and on or about January 11, 1945, warned certain of its employees not to vote in that election, and, in addition, that since November 5, 1944 it had assisted, dominated, encouraged, contributed to the support of and interfered with the administration of the Brown Company Office Workers Association in six specified ways. It is alleged specifically that the respondent (1) permitted its supervisory employees to be active in the formation of the Association, (2) permitted them to solicit membership therein, (3) permitted the solicitation of memberships in the Association on Company time and property, (4) permitted certain of its employees to take time away from their work for the purpose of soliciting memberships in the Association, (5) permitted the use of its office facilities, including its telephone system and photostatic equipment, for the purpose of aiding the Association and carrying on its business, and (6) suggested to certain of its employees that they consult an attorney named by it for the purpose of procuring advice as to the formation of the Association. The Association was allowed to intervene at the hearing held on this complaint before a trial examiner. Only the Board elected to call witnesses at that hearing.

Following the hearing the trial examiner dismissed the complaint for lack of supporting evidence insofar as it charged that the respondent had warned some of its employees that working conditions would deteriorate in the event that the Union won an election then pending and had warned certain of its employees that they should not vote for the Union in that election. The trial examiner found, however, that the respondent had been guilty of unfair labor practices as defined in § 7 of the Act, 29 U.S.C.A. § 157, by reason of assistance and support given by it to the Brown Company Office Workers Association. With one exception to be noted hereafter the Board adopted the findings, conclusions and recommendations of the trial examiner and affirmed his ruling.

The facts may be stated as follows:

United Mine Workers of America, District 50, A.F. of L., hereinafter referred to as the Union, organized the respondent's production and maintenance workers during 1940, and since 1941 it has represented and bargained with the Brown Company for that group of employees through an affiliate, Pulp, Sulphite and Chemical Workers Local Union No. 12175. Early in 1944 the Union organized the respondent's pulp wood truck drivers and it has represented them ever since.

There is no evidence that the Brown Company was in the slightest degree hostile to the Union at any time during the above 5 year period. On the contrary the president of the local union, when testifying as a witness for the Board in the § 10(b) proceedings underlying this petition said, and his testimony was neither contradicted nor questioned, that during that entire time, the respondent had never interfered with the Union's organizing activities; that after the establishment of the Union it had frequently consulted with the Union when it was under no contractual obligation to do so; and that there had always been "an attitude of mutual respect and confidence" and "an attitude of friendly cooperation" between the officers of the Union on the one hand and the management of the respondent on the other.

■ During the summer of 1944, following its organization of the respondent's pulp wood truck drivers, the Union took a few tentative steps toward organizing the respondent's office workers. In this group there were some 270 persons divided into 29 departments scattered throughout the various units of the respondent's plant which extends over an area some three miles in length. Each department was under the supervision of a department head and some of the departments in addition had assistant department heads. The Board

contends that there were 19 persons who should properly be classified in this latter sub-category. It may be conceded that all 48 of these officials (department heads and assistant department heads) as a practical matter had the power to bring about the discharge of rank and file employees in their respective departments, although actual discharge was handled by the respondent's personnel director. It follows that all of them are to be classified as supervisory officials.

We must infer, however, in spite of their somewhat high sounding titles, that they were "not high in the .factory hierarchy." International Ass'n of Machinists v. National Labor Relations Board, 311 U.S. 72, 80, 61 S.Ct. 83, 89, 85 L.Ed. 50. There were too many of them in proportion to the number of persons in the office worker group to warrant any other inference, (as one of the office workers testified "The place is full of supervisors") and there is no evidence that they had anything to do with formulating the respondent's corporate policy but were only entrusted with the allocation of work and other administrative details within their respective departments.

The order which the Board here seeks to have us enforce rests upon inferences drawn by the Board from findings made by it with respect to the participation of some of these supervisory officials in the organization of the Brown Company Office Workers Association which we shall now proceed to consider.

The organizational activities of the Union with reference to the respondent's office workers, which began in the summer of 1944, culminated, and so far as the present record is concerned ended, with a meeting called by it on November 5. Notice of this meeting was given three days in advance by means of letters sent by the officers of the local union, who styled themselves therein the "Organizing Committee of the Brown Company," to some 50 or 60 office workers of their selection. In these letters, after giving the date and place of the meeting, its purpose was stated to be

"to acquaint you with your rights under the National Labor Relations Act." Following this some advantages of organization under the banner of the Union were suggested, and the letters closed with the request: "Please make a very special effort to attend this important conference and if possible bring an office worker friend with you that may not have received this invitation."

The Board found that immediately following this announcement by the Union two admittedly rank and file office workers named Tourangeau and Oleson, neither of whom had received the Union's letter, "openly, on the respondent's time and property, with full knowledge of the respondent's supervisors, embarked on a campaign designed to frustrate the Union." It found that approximately 175 of the respondent's office workers attended this meeting; that it was " 'packed' with anti-union elements"; and that among those in attendance were supervisory officials "including the head of its accounting department, other department heads and various assistant department heads." [1] The only evidence in the record, however, is that only two supervisory officials attended—one the head of the accounting department and the other one of two female supervisors of the stenographic pool—and there is no evidence that either of them were more than passive observers.

Some of the rank and file office employees, however, particularly Tourangeau and Oleson, were outspoken at this meeting in opposition to the Union.

The Board found that during the meeting both of the latter asked questions of the chairman which indicated their hostility to the Union, and that eventually Oleson offered a motion to the effect that it was the sense of the gathering not to affiliate with the Union. On the refusal of the chair to entertain this motion the meeting broke up. Immediately thereafter a small group of office workers headed by Tourangeau and Oleson met at the latter's house and decided to form an independent labor organization. There is no evidence or find-

---

[1] It appears that the presence of these supervisory officials at the meeting was known to the Union organizers, but it does not appear that they objected.

ing that any supervisory official suggested this gathering, attended it, or had anything whatever to do with it.[2] On the following day Tourganeau and Oleson prepared a letter setting forth their aims which we reproduce in the margin.[3] This letter was printed at Tourganeau's expense and distributed the next day under circumstances to be described presently.

On the day the letter was written (November 6) Tourangeau and Oleson called upon the respondent's resident attorney, told him that they intended to form an independent labor organization, and sought his advice and guidance. They were told by the attorney that since he represented the respondent he could not advise them but he suggested that they retain counsel. Apparently several if not all of the members of the local bar were named in the course of the discussion which followed, but there is no evidence or finding that any particular one was singled out for recommendation. The Association subsequently retained the City Solicitor of Berlin who had no connection whatever with the respondent.

On November 7 Tourangeau and Oleson and the latter's brother Warren, also a rank and file office worker, prepared a petition worded "We, the undersigned, are desirous of forming a local office workers Protective Association." It appears that this petition was drawn by Warren Oleson in the respondent's office during working time. Then Tourangeau and Oleson, assisted by Warren Oleson, at once began to circulate separate copies of the petition for signature by the office employees, and as they circulated the petition they also distributed copies of the letter which had been printed the preceding day.

Solicitation was open, during working hours, and with full knowledge of supervision. At first it was on the respondent's time, but later in the day the solicitors were told by their supervisors to circulate the petition on their own time. They immediately asked for time off, their request was granted, and they then proceeded as before with their circulation of the petition. It appears that the solicitors' time off was not deducted from their pay, but that they were required to make it up, that this was in accordance with respondent's customary practice whenever office workers requested and were given time off to attend to their personal affairs. Furthermore it

---

[2] Tourangeau and Oleson both testified, but the Board, although requested, declined to find, that their reason for calling this gathering was antagonism to the Union for the reason that one of its out of town speakers after the meeting said to them, and to some other office workers standing near them in a group, that the Union was going to organize them whether they liked it or not. Tourangeau testified "The thing that antagonized us was one of the speakers stating, after the meeting was held, whether we liked it or not they would go ahead and organize."

Oleson's testimony was:

"Q. What was the purpose of this meeting at your home? A. After the threat that was given us—

"Q. What threat? A. That Mr. Crawford spoke.

"Q. You have not mentioned a threat. A. The threat to us, in deliberately pointing at us and saying, 'Whether or not you like it, we will go ahead and organize you.' We took it as a threat."

[3] "November 6, 1944.
"Fellow Co-Worker:

"A United Mine Workers meeting was held at the Costello Hotel Sunday afternoon at three o'clock. The union presented their policies, which offered the salaried office worker nothing. It appeared to be the impression of the majority of those attending the meeting that the Union fee of one dollar a month or twelve dollars a year, of which 75% goes to the national headquarters, would be wasted.

"We therefore feel that in order to better protect and maintain present benefits and advantages, of which we are interested in locally, that it would be to our best interests to form a protective group interested solely in our problems. This group would meet and elect a committee who would serve as representatives of the office workers. This group would function if and when an individual wishes the handling of his or her case through the usual procedure.

"The cost of such an organization of our own would be nominal.

"Alfred Tourangeau
"Maurice Oleson."

appears that ordinarily office workers were given time off whenever they asked for it. The petition was openly circulated throughout the various buildings of the respondent's plant, contact with employees being made while at their work, and the solicitors were neither stopped, reprimanded, nor interfered with in any way.

From November 7 to November 9 the circulators of the petition obtained the signatures of about 250 employees, including seven department heads and 12 [4] assistant department heads. One department head asked to be allowed to sign the petition— the others all signed upon solicitation by some rank and file office worker.

On November 9 a general meeting of the signers of the petition and other office employees of the respondent was held for the purpose of perfecting the Association's organization. The Board found that some of the supervisors who signed the petition were present at this meeting; that the petition was used as a roll, the names being read and a record of attendance made; and that Tourangeau and Oleson were elected co-chairman of the organization.

After this meeting, on November 18, pursuant to appointment, the officers of the Association and their attorney met with representatives of the respondent's management for the express purpose of obtaining recognition. The original petition, fully signed, was presented as evidence of the Association's majority, but the respondent, objecting to the presence of some of its supervisory employees in the Association's membership, refused to recognize it until it had been certified by the Board. The Association has never been certified and the Board found that the respondent has never either recognized the Association or dealt with it in any way.

Following this conference the Association on November 24 circulated a second petition prepared by its attorney in the form ordinarily used in New Hampshire in the formation of a voluntary corporation not organized for profit (R.L.N.H. Ch. 272) entitled "Articles of Agreement— Brown Company Office Workers' Association." The Board found that this petition was circulated and signatures to it were obtained by the same methods used when the first petition was circulated, and that, notwithstanding the respondent's objection to the fact that some of its supervisory officials' names appeared on the first petition, a majority of the supervisors who signed the first petition also signed the second.

On January 4, 1945, the Association held a formal meeting at which officers were elected, and at this meeting two of the respondent's supervisory officials participated to the extent of each moving the election of a director. It does not appear that any supervisory official ever held office in the Association or ever, either directly or indirectly, influenced or attempted to influence its policies.

The only evidence having any tendency to show hostility on the part of any supervisory official to the Union is certain testimony of the President of the Local Union with reference to a conversation he had with Alfred Watt, the respondent's personnel director, which the trial examiner referred to in a footnote appended to his report. It appears from this footnote that one Robert Murphy, who had been a production worker and as such a member of the Union, had at his own request been transferred by the respondent to office work and that after his transfer had retained his Union membership. It does not appear that the respondent objected to his remaining a member of the Union, but the local union's president when asked to report a conversation he had with Alfred Watt in the latter's office said: "Merely we mentioned the office workers' organization, as I recall it, and Al said he didn't think it was quite proper or quite right for Bob Murphy to help to organize the office workers under the United Mine Workers after the way the company treated Bob in giving him an office job."

---

[4] It may be that 3 others with powers equal to assistant department heads should be added to this number. The record is not clear. But in the view we take this is unimportant.

On the basis of the foregoing, the Board, affirming the trial examiner,[5] concluded "that the respondent has dominated and interfered with the formation and administration of the Brown Company Office Workers' Association, Incorporated, and has contributed support thereto, and that thereby the respondent has interfered with, restrained, and coerced its employees in the exercise of rights guaranteed in Section 7 of the Act."

The question presented is whether the foregoing finding rests upon substantial evidence. A careful study of the record leads us to the conclusion that it does not.

In the first place no ultimate finding of an unfair labor practice can properly be predicated upon the subsidiary finding that the respondent permitted the Association to organize in its plant, on its time, and with the aid of its telephone and other facilities. The reason for this is that there is no evidence that the Union requested and was denied similar privileges, and there is clear and undisputed evidence that the respondent gave the Union in its organization of the production and maintenance workers and pulp wood truck drivers the identical privileges which it later extended to the Association when it organized the office workers. Both the Association and the Union are conceded to be labor organizations and as such under the Act the respondent must accord them the same treatment. Ballston-Stillwater Knitting Co. v. Labor Board, 2 Cir., 98 F.2d 758, 762. Certainly it cannot be said that when the respondent gave the rival labor organizations equal privileges, it disobeyed the Act by favoring one of them over the other.

In the second place there is no finding, or evidence to support a finding, that the respondent or any of its supervisory officials had ever adopted a hostile attitude either toward unions in general or toward outside unions in particular. There is no evidence that the respondent ever spied upon the Union or interfered in any way with its organizational or other activities, or that it had ever discharged, demoted, discriminated against, threatened, censured or even criticized any employee for joining the Union or promoting its interests. Furthermore it has never recognized the Association. There is only evidence from which it might be inferred that Tourangeau and Oleson, and possibly some others in their grade of employment, were hostile to outside unions. But concededly these opponents of the Union were all rank and file employees and as such their attitude is not attributable to the respondent. In fact their hostility to the Union was a matter with which the respondent could not concern itself without violating the Act. The only testimony having the slightest tendency to indicate Union hostility on the part of any supervisory official is that of the Union's president with reference to his conversation about Bob Murphy with the respondent's personnel director to which we have already referred. But at the most the statement attributed to the latter is colorless, (the trial examiner evidently so regarded it since he referred to it only in a footnote, and then only as evidence without using it as the basis for a finding) and furthermore the statement fades into insignificance in the light of the Union president's testimony that his relations with the respondent's personnel director on Union matters had always been of the "very best."

On the other hand there is clear, abundant and uncontradicted positive evidence that from the beginning the respondent had consistently shown a friendly and cooperative spirit in its dealings with the Union and its officers. On such a record as this, since "The employer's attitude toward unions is relevant" (N.L.R.B. v. Link-Belt Co., 311 U.S. 584–588, 61 S.Ct. 358, 361, 85 L.Ed. 368), we feel that in spite of the Board's refusal on request to make a positive finding we must conclude that the respondent's attitude towards unions in general and the outside Union here involved in particular has always been friendly, or at

5 It corrected one of his findings, however. The trial examiner found that the Association had made no provision for the collection of dues but had obtained funds through a bank loan endorsed by respondent's officers and its attorney.

The Board referred to this finding as inadvertent and corrected it by saying, "However, the record shows and we find that the loan was endorsed by the officers and attorney of the Association and not those of the respondent."

least neutral. Thus the specific acts of the respondent's supervisory officials, to which we now turn, which the Board found to have constituted unfair labor practices, must be viewed against a background of five years of harmonious relations with the charging Union.[6]

At this point it is to be borne in mind that there is no evidence or finding that any supervisory official either opposed the Union's organizational activities or advocated the formation of the Association. If attendance at the Union's meeting of November 5 was drummed up, and if that meeting was "'packed' with anti-union elements" that was the work of rank and file employees, particularly the work of Tourangeau and Oleson. And the idea of forming the Association was also theirs. In view of the respondent's friendly relations with the Union, there is not even room for the inference that in doing what they did Tourangeau and Oleson hoped to curry favor with the respondent. For all that appears both men acted independently and on their own initiative in opposing the Union and advocating the Association. It is therefore clear that no conclusion of interference by the respondent with its employees' right to self-organization can rest upon the activities of these two men.

Furthermore is must be borne in mind that there is no evidence, or finding, that any supervisory official ever solicited memberships in the Association or even spoke in favor of it. Thus all that appears is that two supervisors of the respondent's office workers, without objection, attended the Union's meeting of November 5 but took no part in it, and that approximately one-third of these supervisory officials passively participated in the formation of the Association by signing petitions circulated by rank and file workers—one signing at his own request and the others upon solicitation.

The Board contends that special significance derives from the positions in which some of the supervisors' names appear on the petitions. It is true that one supervisor signed under Maurice Oleson's name at the top of one petition, that another supervisor signed fifth on another copy of it, and that the names of two supervisors appear first and second on still a third copy of the petition. But it is to be noted that their signatures on this third copy of the petition were not on the petition itself, but on a sheet without heading attached thereto for the accommodation of additional signatures. The places in which the supervisors signed seem to us of trifling importance. What is important is that they signed at all.

■ Perhaps as an abstract proposition it might be inferred that signatures of supervisory officials on petitions like those circulated by Tourangeau and Oleson would have some tendency to influence rank and file employees to sign also. But § 8 (1,2) of the Act uses stronger words than "influence". It condemns as unfair labor practices "to interfere with, restrain, or coerce" employees in the exercise of the right given to them by § 7 of the Act to form, join or assist labor organizations of their own choosing, and "to dominate or interfere with" the formation or administration of such an organization. Furthermore acts of supervisory officials are not to be viewed in vacuo. Instead they are to be "taken in their setting" (N.L.R.B. v. Link-Belt Co., supra, 311 U.S. 599, 61 S.Ct. 366, 85 L.Ed. 368) and so taken we think the inference drawn by the Board from the acts of the respondent's supervisory employees is too tenuous to constitute substantial evidence that the rank and file office workers were even influenced to join the Association. That is to say, we think the fact that some of the respondent's supervisors signed the petitions, standing by itself against a background of years of harmonious if not cordial relations between the respondent and the Union, cannot in reason be regarded as substantial evidence of an unfair labor practice. Instead we think the supervisors' signatures can at the most be considered as constituting only a scintilla of evidence, or as only evidence enough to raise a suspicion, (N.L.R.B. v.

[6] We pass, as counsel for the Board has passed, the allegation with respect to the recommendation by the respondent of a particular attorney to represent the Association since it is obvious from the evidence that the respondent only advised the officers of the Association to obtain legal advice.

456

Columbian Co., 306 U.S. 292, 300, 59 S.Ct. 501, 83 L.Ed. 660) that the office workers in fact were influenced, to say nothing of interfered with, restrained, coerced or dominated, by the respondent in their choice of a labor organization.

Decided cases bear out this conclusion. Naturally cases of this sort vary greatly on their facts and so of necessity each one must be decided largely as an individual instance. Nevertheless it seems to us pertinent to note that there has come to our attention no case involving acts of supervisory officials in which a court has enforced or affirmed a cease and desist order of the Board except cases in which there was either a record of hostility toward the outside union, or else evidence of discriminatory discharges or of active solicitation by supervisors, or some other pointed indication of the employer's anti-union sentiment. See International Ass'n of Machinists v. Labor Board, 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50; H. J. Heinz Co. v. Labor Board, 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309; National Labor Board v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368; New Idea v. Labor Board, 7 Cir., 117 F.2d 517; National Labor Board v. Moench Tanning Co., 2 Cir., 121 F.2d 951; National Labor Board v. Aintree Corp., 7 Cir., 132 F.2d 469, certiorari denied 318 U.S. 774 63 S.Ct. 831, 87 L.Ed. 1144; Marlin-Rockwell Corp v. Labor Board, 2 Cir., 133 F.2d 258; National Labor Board v. Franks Bros., 1 Cir., 137 F.2d 989, affirmed 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 435; National Labor Board v. Brezner Tanning Co., 1 Cir., 141 F.2d 62; National Labor Board v. Engineering & Research Corp., 4 Cir., 145 F.2d 271, certiorari denied 323 U.S. 801, 65 S.Ct. 560; National Labor Board v. Mt. Clemens Pottery Co., 6 Cir., 147 F.2d 262.

On the other hand, there are cases in which courts have refused to enforce Board orders in situations comparable to the present even though there had been, as there were not here, isolated instances of aggressive anti-union activity by supervisory officers. See National Labor Board v. Swank Products, Inc., 3 Cir., 108 F.2d 872; National Labor Board v. Mathieson Alkali Works, 4 Cir., 114 F.2d 796.

The case closest to the present on the facts which has come to our notice is National Labor Board v. Sun Shipbuilding, etc., Co., 135 F.2d 15, and in it the Circuit Court of Appeals for the Third Circuit refused to enforce the order of the Board. In so far as any other decision is authority, this is, and on it as well as for the reasons stated in this opinion we conclude that in the exercise of our powers under the Act we ought not to enter a decree enforcing the order of the Board.

A decree will be entered dismissing the Board's petition.

FORD, District Judge (dissenting).

I find myself in disagreement with my colleagues and must dissent for the following reasons:

The principal issue before the Board was whether the employees had just cause to believe that the supervisors were acting for and on behalf of the management. Cf. International Ass'n of Machinists v. Labor Board, 311 U.S. 72, 80, 61 S.Ct. 83, 85 L.Ed. 50. Admittedly, the employer's opposition to unionism has generally been one of the factors on which the Board has based its order in this type of case. So where an employer has previously complied with the provisions and spirit of the Wagner Act, there is absent a common basis for an inference that the employees had just cause for such a belief. But there may be other bases. For the strict "hands off" policy enunciated by the Supreme Court in the International Ass'n of Machinists v. National Labor Relations Board, 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50, H. J. Heinz Co. v. National Labor Relations Board, 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309, and National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368, cases cited in the majority opinion, embraces all labor organization, whether conducted against a background of peaceful or antagonistic labor relations. In those cases there existed the definite possibility that the minor supervisory employees, none of whom had the power to hire and

fire, were acting individually as prospective union members and not as representatives of the management. The chief significance of the employers' anti-union attitude was in linking the activities of the minor supervisory employees to the management. Here we have a different situation. Recommendations for discharge by eight of the active supervisors were unquestioned by the management. Surely none of these men was a prospective proper member of a union of office workers. Therefore, the respondent's attitude while concededly benevolent toward the unionization of its factory workers, is less significant than in the Supreme Court cases cited.

In International Ass'n of Machinists v. Labor Board, 311 U.S. page 80, 61 S.Ct. 88, 85 L.Ed. 50, Mr. Justice Douglas cautioned that subtle factors may restrain the "complete and unhampered freedom of choice which the Act contemplates." The respondent's supervisory employees seem by their conduct to have exerted such subtle restraint in the instant case.

The ratio of supervisors to office workers signing the first petition was 1 to 13. Eight of them had the authority to effect the immediate discharge of their subordinates; the remaining eleven had the power to recommend discharges. All but one attended the first organizational meeting, held after 247 of the 269 office workers had been signed up within two or three days. Their very presence would have the tendency to restrain the employees' choice and thus affect the employees' rights of self-organization. After all, the question of interference or coercion should be looked at from the employees' standpoint.

It is true that when the bargaining committee of the Association presented the petition to respondent for the purpose of obtaining recognition, respondent objected to the membership of department heads, supervisors in the stenographic pool, and certain other confidential employees. But a week later, 15 supervisors signed the "Articles of Agreement". Five weeks thereafter, supervisors moved the nomination of two directors at a meeting to elect the Association's officers and directors. At no time did the respondent declare its

neutrality to the employees as a whole. These facts might well persuade the ordinary employee, having in mind the actual authority of the supervisors, that their participation in the formation of the Association had the approval of the management. H. J. Heinz Co. v. Labor Board, supra, 311 U.S. page 521, 61 S.Ct. 320, 85 L.Ed. 309; National Labor Board v. Link-Belt Co., supra, 311 U.S. page 599, 61 S.Ct. 358, 85 L.Ed. 368.

Our scope of review here is narrow and it is my view there was substantial support in the evidence for the finding of the Board that the respondent has interfered with its employees in the exercise of rights guaranteed by Section 7 of the Act and is thereby guilty of an unfair labor practice as defined by Section 8(1) of the Act. I would enforce the Board's order.