**NATIONAL LABOR RELATIONS BOARD v. L. RONNEY & SONS FURNITURE MFG. CO.**

No. 13315.

United States Court of Appeals
Ninth Circuit.

Aug. 24, 1953.

George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Owsley Vose, Louis Schwartz, Attys., National Labor Relations Board, Washington, D. C., Howard F. LeBaron, Director, National Labor Relations Board, Los Angeles, Cal., and Edward Friedman, Atty., National Labor Relations Board, Washington, D. C., for petitioner.

Richard A. Perkins and Arthur Garrett, Los Angeles, Cal., for respondent.

Before MATHEWS, BONE and ORR, Circuit Judges.

BONE, Circuit Judge.

This case comes to us on the petition of the National Labor Relations Board for enforcement of its order against respondent and on respondent's cross-petition for modification of the order and application for leave to adduce additional evidence.

At the outset we are met with a question as to the jurisdiction of the Board. The unfair labor practice charges which gave rise to this proceeding were signed by former employees of respondent. Respondent contends that in filing the charges these former employees acted merely as "fronts" for the United Furniture Workers of America, CIO, Local 576 (herein Local 576). It is pointed out that the charges were solicited and prepared by Local 576 and counsel for that union represented the nominal charging parties at the hearing. And since Local 576 was not in compliance with the non-Communist affidavit requirements of § 9(h) of the National Labor Relations Act, as amended,[1] respondent asserts that

1. § 9(h) of the Act reads as follows:

"§ 9(h) No investigation shall be made by the Board of any question affecting commerce concerning the representation of employees * * * and no complaint shall be issued pursuant to a charge made by a labor organization * * * unless there is on file with the Board an affidavit executed contemporaneously or within the preceding twelve-month period by each officer of such labor organization and the officers of any national or international labor organization of which it is an affiliate or constituent unit that he is not a member of the Communist Party or affiliated with such party, and that he does not believe in, and is not a member of or supports any organization that believes in or teaches, the overthrow of the United States Government by force or by any illegal or unconstitutional methods. * * *"

the Board lacked jurisdiction to issue the complaint.

While there is some question whether Local 576 was in compliance with § 9(h) at the time the complaint was issued, the critical date, N. L. R. B. v. Dant, 344 U.S. 375, 378–379, 73 S.Ct. 375, it is unnecessary to decide this question for in our view Local 576 was not a charging party and § 9(h) is therefore inapplicable. Employees acting individually may assert their rights before the Board without restriction of § 9(h). In the instant case the unfair labor practice charges were signed and filed with the Board by 10 former employees of respondent, each alleging discrimination and other unfair labor practices as against himself or herself individually. The charges were in form and in substance assertions of individual rights. They were not made less so because Local 576 assisted or directed the employees in preparing the charges, or because counsel for Local 576 represented the employees at the Board hearing, or because Local 576 might incidentally benefit from the Board's order. The problem is essentially the same as in N. L. R. B. v. Globe Wireless, 9 Cir., 193 F.2d 748, 749, note 1, where we quoted with approval from N. L. R. B. v. Augusta Chemical Co., 5 Cir., 187 F.2d 63, 64, as follows: " 'Granted that the disqualified union was active in assisting, indeed in directing, the employees in preparing their charges, it does not at all follow that the employees, by accepting that assistance, disqualified themselves.' "

Nothing to the contrary can be found in N. L. R. B. v. Happ Bros., 5 Cir., 196 F.2d 195 and N. L. R. B. v. Alside, 6 Cir., 192 F. 2d 678, on which respondent relies. In each of those cases the court held that where the president and chief protagonist of the interested but disqualified union had filed unfair labor practice charges on behalf of himself and a great number of other union employees, he was really acting as a representative of the union and not as an individual. Those cases have no application here.

We turn now to the facts from which the Board concluded that respondent was guilty of unfair labor practices. Respondent is a family partnership engaged in the manu-facture of furniture in Los Angeles. In the years prior to and including 1948 respondent was a member of an association of employers whose employees were represented in collective bargaining by Local 576 (CIO). In the Los Angeles area during this period the jurisdiction of Local 576 extended primarily to upholstered furniture factories, while the "case goods" or woodenware plants were predominantly AFL. Respondent was principally a case goods manufacturer. Since the CIO commanded generally higher wages than the AFL, respondent under its contract with Local 576 was required to pay wages about 20 cents an hour in excess of those paid by most of its competitors. Respondent's contract also required it to pay a $3.00 monthly health insurance premium for each of its employees. The contract thus placed respondent at a competitive disadvantage. It contained other provisions regarded by respondent as burdensome. When in 1948 it appeared that the majority of the CIO employers group were prepared to indorse a master contract which was substantially the same as the existing contract, respondent in the spring or early summer of that year withdrew from the association and notified Local 576 that it would terminate its contract on September 1, 1948, the anniversary date of the contract.

At about the time of its withdrawal from the association, respondent engaged a labor relations consultant, Joseph Brodine, who was representing certain other employers who had withdrawn from the association. Brodine informed Sam Ronney (one of the respondent co-partners) that the AFL was organizing a new local for furniture workers in the area (Local 2488) and that there was a good chance of getting the AFL in respondent's plant. At Brodine's suggestion, Ronney prepared a list of respondent's employees with up-to-date addresses, and submitted it to Brodine to be turned over to the Los Angeles District Council of Carpenters (AFL), which was directing the organizational campaign of Local 2488. Ronney in his testimony gave the reason for this action: "I was very anxious to get a contract similar with my competitors." The bid of the AFL for respondent's em-

ployees was unsuccessful. Using the list obtained from Brodine, it sent letters to each of respondent's employees but got no returns.

After Ronney had furnished the list to Brodine he consulted another labor relations counselor, Irvin Stalmaster. Stalmaster represented an AFL employers group which in July of 1948 had negotiated a bargaining contract with the AFL. Stalmaster advised Ronney that it had been a mistake to send the list to the AFL and that he should begin negotiations with Local 576 for a new contract. Ronney thereupon discharged Brodine and engaged Stalmaster as counsel. Negotiations with Local 576 began in August, 1948.

While the negotiations were in progress respondent called two or three formal meetings of its employees and conducted informal discussions at the morning and afternoon rest periods at which Ronney and other representatives of management spoke to the employees concerning the points of disagreement between respondent and Local 576. Ronney told the employees that his proposals were as good, if not better than those of Local 576; that Local 576 was "a bunch of Communists and crooks," and that he would not sign a contract with them; that before he would let the CIO run his plant he would close it down, as he had earned enough money and was keeping the plant open solely for the benefit of the employees. Ronney denied making some of these statements, but at least two Board witnesses testified as to each. The Board, as it had a right to do, credited the Board witnesses.

Respondent closed its plant on November 19, 1948 for economic reasons, as the Board concedes. Negotiations with Local 576 continued. While the plant was closed respondent kept four employees on its payroll. When operations were resumed in January of 1949, Furniture Workers Union, AFL, Local 3161 (herein Local 3161) began to show interest in respondent's plant. As activity at the plant gradually increased in January and February respondent hired an almost entirely new complement of personnel. Only two of the employees who were working at the time of the shutdown

were recalled during this period. One of these failed to report immediately and the position was filled by a new employee. To secure new help Sam Ronney directed his secretary to call Local 3161 (AFL), the State Employment Service, public employment agencies, and to place newspaper advertisements. He gave express instructions not to call Local 576. Most of the new persons employed came from the hiring hall of Local 3161.

On February 17, 1949, the final meeting in the negotiations with Local 576 was held. At this meeting respondent for the first time demanded that the minimum wage be reduced to approximate that which prevailed in AFL plants and proposed that the health insurance program be abandoned. The meeting ended in anger, with the understanding that respondent would submit its final offer in writing. On February 23, 1949, one day before respondent's final offer was transmitted to Local 576, Local 3161 petitioned the Board for certification as bargaining agent for respondent's employees. Neither in the petition nor in the preliminary discussions between respondent, Local 3161 and Board officials was it disclosed to the Board that respondent was still in negotiations with Local 576.

On February 28, 1949, respondent and Local 3161 executed an agreement for a consent election. A list of eligible voters was taken from the February 25, 1949 payroll. On that date respondent had 20 employees. Only five of these had been in the employ of respondent at the time of the shutdown. The remaining 15 were new employees. Nine of the new employees were from the hiring hall of Local 3161. Another accompanied a person who had been sent by Local 3161. Two, though not shown to have been sent by Local 3161, were members of that union. The record does not show where respondent procured the remaining three employees, or their union affiliation.

On March 10, 1949 the election was held. Fifteen of the 20 eligible voters cast ballots and Local 3161 won unanimously. On April 5, 1949, respondent executed a bargaining agreement with Local 3161 containing union-security provisions which, con-

cededly, did not give employees the requisite 30-day period to become union members. After the election respondent for the first time offered employment to several persons who were its employees at the time of the shutdown.

The Board concluded that respondent contributed to the support of and interfered with the administration of Local 3161, in violation of § 8(a)(2) of the National Labor Relations Act,[2] as amended, and interfered with, restrained and coerced its employees in the exercise of their right to remain members of the labor organization of their choice, in violation of § 8(a)(1) of the Act,[3] by the following acts: (1) by submitting a list of the names and addresses of its employees to the AFL to aid in a membership drive; (2) by dealing directly with its employees and disparaging Local 576 and its contract demands; (3) by ordering that no person should be called from the hiring hall of Local 576 when the plant was restaffed after the shutdown; (4) by failing and refusing to recall the employees affiliated with Local 576 who were working at the time of the shutdown; (5) by procuring almost all of the new employees hired after the shutdown through the facilities of Local 3161; (6) by executing and enforcing a contract with Local 3161 which contained illegal union security provisions. The Board also concluded that respondent discriminatorily refused to rehire seven of its laid-off employees because of their membership in Local 576, and thereby violated § 8(a)(3) of the Act.[4]

The Board's order requires respondent to cease and desist from the unfair labor practices found, offer reinstatement to five employees and make them whole for loss of pay, to make whole two employees for loss of pay suffered from the time of the discrimination to the time of offers of reinstatement, to withdraw recognition from Local 3161 unless and until such organization is certified by the Board, and to post the usual notices.

In sum, the Board took the view, which is fully sustained by the record, that respondent for economic reasons adopted a course of action designed to oust Local 576 from its plant and replace it with the AFL, its efforts beginning with the sending of a list of its employees to the AFL and culminating in the restaffing of the plant largely with new employees sent by Local 3161 when the plant resumed operations after the shutdown and execution of an illegal union-security contract with that union.

■■ Respondent's furnishing of a list of the names and addresses of its employees to the District Council of Carpenters (AFL)[5] was an illegal act of assistance under § 8(a)(2) of the Act. Under that section an employer must refrain from all interference with union activities. He must maintain a strictly neutral attitude. Harrison Sheet Steel Co. v. N. L. R. B., 7

---

2. "§ 8. (a) It shall be an unfair labor practice for an employer—
    *    *    *    *    *    *
    "(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it; * * *."

3. "§ 8. (a) It shall be an unfair labor practice for an employer—
    "(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7".

4. "§ 8. (a) It shall be an unfair labor practice for an employer—
    *    *    *    *    *    *
    "(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: * * *."

5. The intended beneficiary of the list was Local 2488 (AFL). At the time of its organization Local 2488 was a rival of Local 3161 (AFL). However, as the Board found, the District Council of Carpenters used the list and sent letters to respondent's employees bearing its own letterhead and soliciting membership in the Council itself and not in a particular local. At the time the list was furnished the AFL, Local 3161 was also affiliated with the Council. Local 2488 was dissolved in June of 1949 and its membership absorbed by Local 3161. The Board therefore found that by submitting the list respondent rendered assistance to Local 3161. While contending that the assistance was not unlawful, respondent does not argue that it was not assistance to Local 3161.

Cir., 194 F.2d 407. An employer does not observe such neutrality where, as here, he takes it upon himself to inaugurate a membership drive among his employees by the union of his preference.

Respondent argues that it was but dealing equally with the AFL and Local 576, since Local 576 already had the information furnished the AFL. It is true that an employer may under some circumstances be permitted, indeed required, to furnish privileges or services to a union upon demand, as where such privileges or services are already being granted a competing union. N. L. R. B. v. Waterman Steamship Corp., 309 U.S. 206, 60 S.Ct. 493, 84 L.Ed. 704; N. L. R. B. v. Brown Co., 1 Cir., 160 F.2d 449; N. L. R. B. v. Clinchfield Coal Co., 4 Cir., 145 F.2d 66. But here the AFL had shown no interest in respondent's plant prior to the time respondent sent it the list. Because of its preference for the terms of the AFL contract respondent invited a raid on the CIO membership in its plant and furnished the means for conducting such raid. This was interference and assistance which the law does not allow.

■ Sam Ronney's statements to the employees concerning Local 576 and the negotiations then in progress were more than expressions of "views, argument, or opinion" within the meaning of § 8(c) of the Act.[6] The statements had a definitely coercive tendency, amounting to threats of a shutdown if Local 576 persisted in its demands. Cf. N. L. R. B. v. State Center Warehouse & Cold Storage Co., 9 Cir., 193 F.2d 156; N. L. R. B. v. Kanmak Mills, 3 Cir., 200 F.2d 542. The Board could properly conclude, as it did, that respondent's opposition "was an attempt to coerce the employees to forsake the CIO by inducing in them the belief that their employer could not possibly meet the demands of their bargaining representative." And Ronney's statements were part of a larger pattern of hostility to the CIO and active assistance to the AFL. There was evidence that as a

result of respondent's prior efforts in aid of the AFL some of the employees, at least, were fully aware of respondent's preference for that organization. In these circumstances the Board was justified in concluding that opposition to the CIO amounting to coercion of its members constituted unlawful assistance to the AFL. Cf. International Association of Machinists v. N. L. R. B., 311 U.S. 72, 78, 79, 61 S.Ct. 83, 85 L.Ed. 50.

■ The Board's conclusion that in restaffing its plant prior to the representation election respondent deliberately ousted Local 576 and supplanted it with Local 3161 is sustained by the evidence. As pointed out above, respondent refused, with minor exceptions, to rehire any of its laid-off employees, as was customary in prior layoffs, and gave express instructions not to consult Local 576 for help. At the same time respondent proceeded to staff its plant largely with new employees sent by the hiring hall of Local 3161. And the Board properly considered the failure of respondent to disclose the interest of Local 576 in the plant to Board officials prior to the representation election, the speed with which a bargaining agreement was reached thereafter, and the fact that the agreement contained union-security provisions requiring old employees to become union members immediately. Respondent would make its conduct appear innocent by contending, among other things, that the reason for its failure to hire Local 576 members was that the wage rates of that union were higher than it was then paying. The fact is, however, that respondent did offer employment to two of its laid-off employees prior to the election and to several others after Local 3161 was firmly seated as certified bargaining agent.

Respondent attacks the Board's finding that it refused to rehire seven of its laid-off employees on account of their membership in Local 576. It is respondent's contention that these employees were refused reinstatement solely because of their inefficien-

6. § 8(c) of the Act reads as follows:
"§ 8(c). The expressing of any views, argument, or opinion, or the dissemination thereof * * * shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act, if such expression contains no threat of reprisal or force or promise of benefit."

cy. Of the seven employees, five were women. Respondent devotes most of its argument to the women employees.

In substance, the evidence supporting respondent on this question, undisputed except where otherwise indicated, was as follows. During the war years respondent had to hire a great number of women on account of the manpower shortage. The women could not do the work as well as the men and consequently the products of the plant were inferior in quality. Because of wartime shortages, however, it was possible to sell the furniture at a profit. After the war respondent began to hire men to replace the women. By 1947 only about 10 of approximately 45 employees in the plant were women. Most of the women, including the five here in question, were concentrated in the finishing department, where they did puttying, sanding, wiping and spraying.

While the testimony as to the efficiency of the women employees was conflicting and some of respondent's evidence doubtless exaggerated, as the trial examiner found, the record as a whole is consistent with no other conclusion than that the women's services were, to say the least, below standard. The Board did not find otherwise. There was abundant evidence that the women were lacking in the skill and strength required to perform their tasks expertly and expeditiously and that they were on occasion careless and wasteful. And it is undisputed that respondent made attempts to secure union consent to their discharge in 1947 and 1948 and that the shop committee and chief shop steward approved such discharge, only to be overruled by the Local 576 business agent.

Sam Ronney explained his failure to discharge the women prior to the 1948 shutdown on the ground that the contract with Local 576 prevented him from doing so. Under that contract respondent, to discharge an employee for any reason, had to (1) secure union consent, or (2) submit the dispute to arbitration, the employee to be kept on the job pending the decision and the employer to bear the costs of the arbitration. Ronney testified that in his opinion the union could not and would not be bound by an arbitration award, and when the union business agent refused to consent to the discharge he declined to press the matter for fear of a strike.

We turn now to the evidence tending to support the Board. There was undisputed evidence that respondent did in fact discharge several persons in the years prior to 1948 without union consent and without being subjected to a strike. Two of these discharges involved women in the finishing department. As to these two women, Ronney prepared a letter signed by the chief shop steward requesting their discharge and sent it to the union. No such action was taken as to the five women here involved. And it is also undisputed that the Local 576 business manager, when he refused to consent to the discharge of the five women in question suggested to Ronney that he submit the matter to arbitration, but Ronney refused. There was evidence that in no instance had the union challenged an arbitration award. In fact, in April of 1948, as a result of an arbitration of a discharge question involving an employee of a member of the CIO employers group, an agreement was made between the employers and Local 576 whereby a permanent impartial umpire was designated to handle such disputes.

Coming now to the shutdown and the later restaffing of the plant, there was evidence, which the Board credited, that respondent told several employees, including at least two of the women here involved, that they would be rehired when operations were resumed, as was customary after layoffs. When the plant was reopened, however, only two out of all the employees who were working at the time of the shutdown, many of whom had worked for respondent for several years, were recalled prior to the representation election. This is difficult to understand if the hiring was done on the basis of the employees' efficiency, for Sam Ronney testified that except in the finishing department the service in the plant was not incompetent or unsatisfactory. And respondent's failure to rehire these employees must be viewed in light of the facts already noted, that respondent refused to consider Local 576 as a source of new help, that it

took most of the new employees out of the hiring hall of Local 3161, and that after Local 3161 was certified as bargaining agent respondent for the first time offered employment to several of the employees laid off at the time of the shutdown.

The Board thought it unnecessary to make a finding as to the efficiency of the employees in question, saying: "The respondent did not select between its former employees and new applicants for jobs on the basis of their individual efficiency, but decided to recall none of them (except Sushan and Gipson) before the AFL was certified." Respondent urges that by taking this position the Board erred in that it ignored facts which were important in appraising respondent's motives. We think not. The Board's position was that, *conceding* that the employees in question were inefficient, that was not the motive of respondent in refusing to rehire them. It is well settled that an employer violates § 8 (a)(3) by discharging or refusing to reinstate an inefficient employee if the employer's reason for so doing is not the employee's inefficiency but his union affiliation or activity. N. L. R. B. v. Electric City Dyeing Co., 3 Cir., 178 F.2d 980; N. L. R. B. v. Dixie Shirt Co., 4 Cir., 176 F.2d 969, 973-4; Edward G. Budd Mfg. Co. v. N. L. R. B., 3 Cir., 138 F.2d 86, 90, 91, cert. denied 321 U.S. 778. The critical question is the employer's *true motive*. As the court said in the Electric City case, supra, 178 F.2d at page 983, " * * * it matters not that for reasons apart from union activity an employee deserves summary discharge if as a fact the reason was union activity."

Here the question is a close one. It is true that the evidence would fairly support the inference that respondent refused to rehire the women on account of their inefficiency, and that they would not have been reinstated even had they not been members of the CIO. But the evidence also supports the inference, which the Board drew, that at the time of the restaffing of the plant respondent was not thinking of its former employees in terms of their efficiency or inefficiency but was concerned solely with ridding itself of Local 576, and that but for their membership

in Local 576 the women employees would have been rehired. Where the evidence fairly supports such conflicting inferences the Board's choice may not be displaced, even though we might reach a different conclusion if the matter were before us *de novo*. N. L. R. B. v. Greyhound Lines, 303 U.S. 261, 271, 58 S.Ct. 571, 82 L.Ed. 831; N. L. R. B. v. Howell Chevrolet Co., 9 Cir., 204 F.2d 79, 85. What we have said as to the women employees applies equally to the two men employees found to have been subjects of discrimination.

There is a separate question concerning the Board's order insofar as it orders reinstatement of the employee Mike Sendejas. Respondent objects to this portion of the order on the ground that Sendejas has already refused an offer of reinstatement. On November 1, 1949 respondent wrote Sendejas a letter which read:

"Please report to our factory on Monday, November 7th, or Tuesday, November 8th, in regard to employment on your old job."

Sendejas did not report, ask any questions or point out any deficiency in the offer. Since respondent at the time of making the offer was enforcing the illegal union-security provisions of its AFL contract, the Board found that the offer was conditional upon Sendejas' compliance therewith and that it was therefore equivalent to an absolute refusal to reinstate. Recognizing that Sendejas is not entitled to reinstatement if he refused employment for reasons unrelated to the conditional nature of the offer, the Board found it not "to be clearly established that he would have rejected the offer in any event and regardless of the requirement of membership in Local 3161."

The Board's finding on this point is not supported by substantial evidence on the record considered as a whole. First of all, Sendejas did not testify concerning knowledge of any AFL contract, though questioned repeatedly on the point. The Board relied upon Sendejas' testimony that he knew respondent's plant was "under the A. F. of L.," and that he felt he would not have "very much chance" at the plant because of having filed unfair labor practice charges against respondent. The latter

reason for refusing employment was unrelated to the conditional nature of the offer. And if Sendejas knew of the union-security provisions of the AFL contract and if this was his reason for refusing employment, it is hard to see why he did not so testify. While there might be doubt if the matter were left here, Sendejas further testified: "* * * if he would have called me before then I would have went * * *. I was already working, and I thought I was pretty well off where I was at." Thus we have Sendejas' express testimony that he would have accepted the offer had he not already obtained satisfactory employment. We think this evidence as a whole is inconsistent with the conclusion that Sendejas refused employment on account of the implicit condition in the offer. The cases cited by the Board are distinguishable. N. L. R. B. v. Cowell Portland Cement Co., 9 Cir., 148 F.2d 237, 245, certiorari denied 326 U.S. 735, 66 S.Ct. 44, 90 L.Ed. 438; Eagle-Picher Mining & Smelting Co. v. N. L. R. B., 8 Cir., 119 F.2d 903, 914; N. L. R. B. v. National Motor Bearing Co., 9 Cir., 105 F.2d 652, 658–659. Sendejas is entitled only to be made whole for loss of pay from the time of the discrimination to the time of respondent's offer of reinstatement.

The final questions concern respondent's application for leave to adduce additional evidence. The evidence pertains in part to the alleged Communist membership of Local 576 officials, the failure of such officials to file non-Communist affidavits with the Board, and certain unfair labor practice proceedings brought against Local 576. This evidence is irrelevant to any issue in the case. The remainder of the evidence is to the effect that after the hearing and issuance of the intermediate report respondent employed or offered to employ persons ordered reinstated by the Board. Such facts run to the question of compliance and are relevant only in post-decree proceedings. N. L. R. B. v. Mexia

Textile Mills, 339 U.S. 563, 567–569, 70 S. Ct. 826, 94 L.Ed. 1067; N. L. R. B. v. Swift & Co., 8 Cir., 129 F.2d 222, 224.[7]

Respondent's application for leave to adduce additional evidence is denied. The petition for enforcement will be granted, but with modification as to the employee Sendejas in accordance with this opinion. The Board may submit an amended decree.

---

7. Respondent in its brief argued that the quarterly basis or Woolworth formula for computing back pay which was prescribed in the Board's order was not sanctioned by the Act. After respondent had written its brief the validity of this formula was upheld in N.L.R.B. v. Seven-Up Bottling Co., 344 U.S. 344, 73 S.Ct. 287, as respondent conceded in oral argument.