246 F.2d 886
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
Jack LEWIS and Joe Levitan, a Copartnership Doing Business
as California Footwear Company and Trina Shoe
Company, a Corporation, Respondents.
 No. 15169.
 United States Court of Appeals Ninth Circuit.
 July 1, 1957.
 
 Jerome D. Fenton, Gen. Counsel, Stephen Leonard, Associate Gen. Counsel, Duane Beeson, Arnold Ordman, Attys., N.L.R.B., Washington, D.C., for petitioner.
 Richard A. Perkins, Los Angeles, Cal., for respondents.
 Before DENMAN, Chief Judge, and CHAMBERS and BARNES, Circuit Judges.
 CHAMBERS, Circuit Judge.
 
 
 1
 We have here labor-management conflicts involving United Shoe Workers, Local 122, (including some of its members) and the employers, California Footwear Company and Trina Shoe Company.[1]
 
 
 2
 After formal complaints were filed and hearings had, the respondents were found guilty of a number of the charges. We have concluded the board's order must be enforced.[2]
 
 
 3
 California Footwear Company is a partnership composed of Jack Lewis and Joe Levitan. It has a history in the Los Angeles area as a small manufacturer of women's shoes. In 1952 it was operating in leased space on Los Angeles Street in downtown Los Angeles. Its lease was due to expire during February, 1953. Higher rent or a move was imminent. Another factor which was a consideration in decision appears to have been the health of Jack Lewis who wanted a factory near his home in Santa Monica, some 12 miles westerly.
 
 
 4
 During the fall of 1952 and through December, California had working in the Los Angeles plant a skilled pattern maker, one Maurice Fellman. For a few years before coming there to work Fellman had had his own small manufacturing plant at Costa Mesa, near Laguna Beach. His little business had been conducted through his wholly owned corporation called Trina Shoe Company. Although Trina did not prosper, it did not meet a legal death. It had some assets in the form of shoe making machinery and some liabilities and while Fellman went to the city to work, Trina slept in Costa Mesa.
 
 
 5
 About the last of November, 1952, the partners of California leased for five years premises at 222 South Main Street, Venice, near Santa Monica. It was determined by Lewis and Levitan (California) and Fellman (Trina) that Trina would become California's manufacturer and California would take the product and sell it. As of January 1, 1953, a sublease was executed from California to Trina and Trina moved into what was the major portion of the Venice building. It may well be for tax purposes, for example, the entities were separate. But for application or rules on unfair labor practice the board was justified in finding that Trina at Venice for the year 1953 was the alter ego of California. In the production work, Levitan, Jack Lewis and Jack's son Albert were ubiquitous. If the role of Levitan and Jack Lewis was only inspection, it was certainly complete. And, interestingly, Albert Lewis was paid more salary by Trina than Fellman.
 
 
 6
 Returning now in point of time to late 1952 and early 1953, we find that the move to Venice was made gradually. California in early January, 1953, had Trina's machinery and tools brought up to Venice from Costa Mesa. Production continued at California on Los Angeles Street until about the end of its lease in February. Then its machinery was moved out to Trina in Venice. Some of the machinery duplicated that which Trina already had. There may have been some production at Venice as early as January 10, 1953. It would appear that production there was substantial by February 15, 1953.
 
 
 7
 There were 20 to 30 workers varying in skill and jobs, first at California, then at Trina. Only a few of those from Los Angeles Street turned up on the payroll at Venice. California had a union ship contract (almost a closed shop, but not quite). It was in force at the time of the winding up of production in Los Angeles. Naturally Local 122, hereafter local, was anxious to preserve the same status in the successor plant at Santa Monica. It has not yet succeeded.
 
 
 8
 A majority of the National Labor Relations Board has sustained the examiner in finding that there was a refusal to bargain in 'setting up Trina as a 'front' for itself' and in refusing to bargain about transfer of employees from Los Angeles to Venice. This, it is said, was accomplished by representing that California really was ceasing production. Also the board sustained the trial examiner in finding unlawful interrogation and surveillance, refusal to apply the Los Angeles agreement as covering the Venice employees and unilateral establishment of working conditions and wages at Venice.
 
 
 9
 Discrimination charges originally were listed as to three employees, Blanche Roark, Anna Cherry and Jack Rosenthal. Cherry's plaint has not been sustained. Thus, we are done with her. During the first hearing in November, 1953, an incident occurred which resulted in another charge of discrimination as to a fourth employee, Eugene Piasek. Discrimination has been found as to Roark and Piasek, but rejected as to Rosenthal. However, the Rosenthal story is, in the main, part of the Piasek story, so we cannot yet dismiss him from the sequence.
 
 
 10
 Respondents contend that the union security agreement in the contract was illegal and obligated them to withdraw recognition of Local 122. For this, our case of N.L.R.B. v. L. Ronney & Sons Furniture Mfg. Co., 9 Cir., 206 F.2d 730, certiorari denied 346 U.S. 937, 74 S.Ct. 377, 98 L.Ed. 425, is cited. In Ronney the clause was in a contract with union no. 2 and was found to be part of a plan to oust union no. 1 which as the bargaining representative obtained the first contract with Ronney. In Ronney the employer was deprived by the board and by this court of the benefits of the union security clauses forcing employees into union no. 2 as against union no. 1. Assuming illegality, which we do not decide, it may be pointed out the California Footwear clause here was severable. Further, there is no showing that it was used as a sword by Local 122, although it may have been. Perhaps, if California at the time of shifting to Venice had stood on its claimed illegality of the clause and asserted that as the reason for ignoring the local, the point might have to be given serious attention now. We do not reach the question. In the pleadings respondent only brought the union security clause in slantwise. It does not seem to have been noted in any exception to the trial examiner's report. And if the record were in better shape, we would think our case of N.L.R.B. v. International Ass'n of Machinists, etc., Lodge 1254, 9 Cir., 241 F.2d 695, answers the contention respondent makes here.
 
 
 11
 On the refusal-to-bargain findings, respondents rely heavily on the examiner's finding that 'because of this (increase of rent on Los Angeles Street) and because of poor health and advice of his doctor to 'take it easy' as much as possible, Lewis, who lived in Santa Monica, decided to locate the plant closer to his home.' In our view, the foregoing considerations, which we shall assume at all times were the overriding ones and contained in themselves no elements of improper labor relations, did not justify the attempt which was found to have co-existed 'to shake the union.' There was evidence, disputed of course, on which the trial examiner could find that respondent refused to discuss the transfer of employees to Venice, 12 miles away, from Los Angeles Street. It may be assumed that if the doctor had advised Lewis to go to Sea Island, Georgia, for his health, there might not have been very much of a duty to ask low paid employees about making the move, the incidence of employees desiring to move across the continent to retain a low paying job being not great.[3]
 
 
 12
 But in these plant removal cases, after finding the duty to bargain about the removal, the board swerves one way when it thinks a majority of the local's employees would not have moved away. (See Brown Truck and Trailer Mfg. Co., Inc., 106 N.L.R.B. 999). And another when it assumes they would have moved. (This case, N.L.R.B. .) In the Brown case about 30 miles of rather open road was involved. Here a 12 mile move was made across Metropolitan Los Angeles.[4] (We do not know exactly where in Los Angeles the workers of California lived.) Who on the record can say that the shift in Brown Truck was more forbidding to old employees than the one here? After a detailed study experts might still disagree as to which plant the workers would have been more apt to follow. We are not wise enough to resolve it on 'judicial notice,' but there is merit in Acting Chairman Rodgers' plaint in his dissent in this shoe case that the board is establishing one rule in North Carolina and another in California. But this court can only get at the North Carolina case by talking about it, and can go no further. We believe that majority members of the National Labor Relations Board do not really deny here the contention of Acting Chairman Rodgers that unfair labor practices after the closing of the plant at Los Angeles must stand on two legs:
 
 
 13
 '1. The prior refusal to bargain about transferring employees from Los Angeles to Venice.
 
 
 14
 '2. The assumption that most of local's employees would have transferred to Venice and thus preserved local's majority had it not been for the refusal to bargain about transfer of employees. * * *'
 
 
 15
 The two prevailing members of the board simply find the employees would have transferred. We cannot hold that most of the employees would not have moved.
 
 
 16
 Another matter of some concern to this court is the fact that by ordinary contract principles, after the move to Venice, local's agent may have impliedly agreed to accept Trina as an entity separate from California Footwear. There is a case that California's contract was abandoned by the local. But the examiner's findings are made in such a way that we cannot rule that that was what happened. Cf. N.L.R.B. v. Trimfit of California, 9 Cir., 211 F.2d 206.
 
 
 17
 Dissenter Rodgers and respondents take exception to the findings of discrimination against the employee Roark. The best point for respondent is that the examiner, among other findings, says that 'if Fellman had not been influenced by Lewis, I am satisfied that he would have offered employment to * * * Roark.' That finding comes out of a dark night. It is hard to follow. But there is evidence, not too strong, and upon which findings were made adverse to respondents, which we believe precludes us from disturbing the board's finding on Roark. And we do not believe that the loose apple-- 'if Fellman had not been influenced by Lewis'-- unhinges all of the board's and the examiner's apples from the Roark branch.
 
 
 18
 The original charges pursued by the general counsel through the first hearing included one that Rosenthal, a skilled workman, had been discriminatorily laid off for union activity. Piasek had been hired in his place. During the first hearings held during November, 1953, both Rosenthal and Piasek testified. Rosenthal's testimony was not particularly adverse to management, although he was no longer on the payroll. On the other hand, Piasek, still on the payroll, gave testimony, true or not, which must have made management most unhappy. It would be noted that much of his testimony was in sharp conflict with that of management. And on a number of important incidents the examiner, when he prepared his intermediate report, discredited Piasek's testimony.[5]
 
 
 19
 On November 23, 1953, at the conclusion of the first hearing, counsel for respondent pressed heavily for a commitment from general counsel that he was no longer maintaining that he had proved any case of discrimination as to Rosenthal. Although the charge had worn extremely thin, lawyer like, board's counsel refused to concede and insisted that he was entitled to relief as to Rosenthal. In any event, on that date, the morning of November 23, Rosenthal was back on the job and Piasek was off. This was disclosed later the same day at the hearing. The general counsel on December 4 notified California and Trina that the recent discharge of Piasek was a discrimination. A supplemental charge followed on December 10, 1953, and hearings were held in January, 1954.
 
 
 20
 Probably, if before the first hearing Piasek had been replaced by Rosenthal, management would have been entirely in the clear. Here, though, the examiner finds that Piasek was replaced because of the testimony he gave at the hearing. There is no shortage of cases holding if one discharges an employee, assigning or holding inwardly the wrong reason, it benefits not the employer to have had a justifiable reason which he did not assert or which did not motivate him. The examiner, sustained by the board, found that Piasek was fired on November 17, 1953, although not directly told he was discharged. Rosenthal was recalled by telegram on November 21. The record is not conclusive that there was a discharge of Piasek before the recall of Rosenthal was made, although the discharge of Piasek was undoubtedly being considered by management on November 17, the day after Piasek testified. However, we think we must accept the board's finding as to the date of Piasek's discharge as one we cannot change.[6]
 
 
 21
 There is validity to respondent's assertion that the real offense regarding Piasek was that respondent did not consult general counsel's lawyer during the November hearings until after the re-employment of Rosenthal. On November 23, counsel for the board still maintained and reasserted that the prior discrimination as to Rosenthal was a fact. Even when he filed the supplemental charge on December 10, he did not dismiss as to Rosenthal. Respondents could not have known before the April 28, 1954, report of Trial Examiner Hemingway that they were exculpated on Rosenthal. Even though Piasek was discharged before counsel for the board was told of it on November 23, counsel's position after that date-- 'we will punish you one way or the other'-- hardly comports with fair play. Peace in industrial relations will not be advanced by ordering back pay for Piasek.
 
 
 22
 Perhaps it is not within our discretion to deny the Piasek relief as we find the record. But the board should reconsider it. The court is disposed to promptly enforce the order, except as to 'Piasek, if the board desires; otherwise, to refer the case back to the board for reconsideration of the Piasek matter. Such is our decision.
 
 
 
 [1]
 Respondents concede that they were sufficiently engaged in 'commerce among the states' to be subject to the jurisdiction of the National Labor Relations Board
 
 
 [2]
 After the November, 1953, hearings Fellman and his Trina Shoe Company seem to have disassociated themselves from California Footwear. Recognizing this fact, N.L.R.B. would impose no further duty on Trina, no longer the alter ego of California, to bargain with the local, unless the two became associated together again
 
 
 [3]
 It is perhaps a permissible assumption that the employees in Brown, post, were or a higher skilled and higher paid class than those in California Footwear
 
 
 [4]
 In the Brown case the N.L.R.B. panel consisted of members Houston and Peterson, with Chairman Farmer dissenting. In California Footwear the majority consisted of members Murdock and Peterson with Acting Chairman Rodgers dissenting
 
 
 [5]
 Rosenthal's testimony was not fully credited by the trial examiner, but it seems fair to say that the portion of Piasek's testimony that the examiner disbelieved would be more inflammatory to management than Rosenthal's uncredited testimony
 
 
 [6]
 In its brief counsel for the respondents indicates that Piasek after April 28, 1954, was offered reinstatement, which he declined. Counsel for the board does not dispute this. Therefore, the question now is a matter of some lost wages which do not appear to have been a large amount